437 F.3d 1
 Andrea SKOROS, individually, and next friend of Nicholas Tine, a minor and Christos Tine, a minor, Plaintiffs-Appellants,
v.
CITY OF NEW YORK, Joel L. Klein, in his official capacity as Chancellor, New York City Department of Education, and Sonya Lupion, individually, and in her official capacity as Principal, Edith K. Bergtraum School, New York City Department of Education, Defendants-Appellees.
Docket No. 04-1229-CV.
 United States Court of Appeals, Second Circuit.
 Argued: December 13, 2004.
 Decided: February 2, 2006.
 
 COPYRIGHT MATERIAL OMITTED Robert J. Muise, Thomas More Law Center, Ann Arbor, Michigan, for Plaintiffs-Appellants.
 Cheryl Payer (Stephen J. McGrath, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, for Defendants-Appellees.
 Troy King, Attorney General; Kevin C. Newsom, Solicitor General; Charles B. Campbell, Assistant Attorney General, State of Alabama, Montgomery, Alabama, Amicus Curiae in support of Plaintiffs-Appellants.
 Daniel S. Alter, Steven M. Freeman, David L. Barkey, Anti-Defamation League, New York, New York; Robert G. Sugarman, Todd D. Ommen, Weil, Gotshal & Manges LLP, New York, New York, Amicus Curiae in support of Defendants-Appellees.
 Before: FEINBERG, STRAUB, and RAGGI, Circuit Judges.
 Judge STRAUB concurs in part and dissents in part in a separate opinion.
 RAGGI, Circuit Judge.
 
 
 1
 No holiday season is complete, at least for the courts, without one or more First Amendment challenges to public holiday displays. At issue in this case is the holiday display policy promulgated by the Department of Education ("DOE") of the defendant City of New York ("City" or "New York") for the City's public elementary and secondary schools. That policy allows the menorah to be displayed as a symbol of the Jewish holiday of Chanukah and the star and crescent to be displayed as a symbol of the Islamic holiday of Ramadan, but it does not allow a crèche or nativity scene to be displayed as a symbol of the Christian holiday of Christmas. Plaintiff Andrea Skoros sues pursuant to 42 U.S.C. § 1983 on behalf of herself and her two minor children asserting that the policy violates her children's rights under the Establishment and Free Exercise Clauses of the First Amendment, as well as her parental right to control her children's religious upbringing and education as secured by the First and Fourteenth Amendments. See U.S. Const. amends. I, XIV. While Skoros's complaint seeks to enjoin the operation of the DOE holiday display policy, the record suggests that her goal is not so much to preclude defendants' use of the menorah or the star and crescent as it is to compel inclusion of the crèche in public school holiday displays.[1]
 
 
 2
 After a bench trial, Judge Charles P. Sifton of the United States District Court for the Eastern District of New York rejected plaintiffs' constitutional claims on the merits and entered judgment in favor of the City, as well as co-defendants Joel L. Klein, sued in his official capacity as DOE Chancellor, and Sonya Lupion, sued individually and in her official capacity as the principal of the City's Edith K. Bergtraum elementary school ("P.S.165"). See Skoros v. City of New York, No. CV-02-6439, 2004 U.S. Dist. LEXIS 2234 (E.D.N.Y. Feb. 18, 2004). Skoros now appeals that judgment, and the State of Alabama appears as amicus curiae to support her challenge. In urging affirmance, defendants have the support of the Anti-Defamation League as amicus curiae.
 
 
 3
 For the reasons stated in this opinion, we affirm the judgment of the district court. We emphasize at the outset that we do not decide on this appeal whether, consistent with the First Amendment, the DOE could ever include a crèche in a public school winter holiday display. We decide only that the defendants do not violate the Constitution when, in pursuing the secular goal of promoting respect for diverse cultural traditions, they do not include a crèche in such displays, representing Christmas through a variety of that holiday's well recognized secular symbols, even though Chanukah is represented by the menorah and Ramadan by the star and crescent.
 
 I. Background
 A. Plaintiff Skoros and Her Children
 
 4
 Plaintiff Andrea Skoros is a Roman Catholic raising her two minor sons, Nicholas and Christos Tine, in that faith. During the 2001-2002 school year, Nicholas was a third-grade student at New York City's P.S. 165. In the 2002-2003 school year, Nicholas attended fourth grade at P.S. 169, while his brother Christos attended second grade at P.S. 184. The boys remained in these public schools through the trial of this case.
 
 B. The New York City Public School System
 
 5
 New York City has the largest public school system in the country, with over one million students enrolled in its 1200 public schools and programs. This student population, like the population of the City itself, represents virtually every race, nationality, ethnicity, and religious and cultural tradition in the world. City public school students speak 140 different primary languages, including Spanish, Chinese, Russian, Urdu, Bengali, Haitian-Creole, Arabic, Korean, Albanian, French, Punjabi, and Polish. More than 125,000 students are enrolled in programs to learn English.
 
 C. The Challenged Holiday Display Policy
 
 6
 For some time, City educators have recognized the obvious: young schoolchildren are often excited toward the end of the year about approaching holidays. School officials decided that this excitement could be channeled constructively by using the variety of year-end holidays — including Christmas, Chanukah, Ramadan, and Kwanzaa[2] — to teach children about and to encourage respect for the different cultures in their community. Because some of the identified holidays have religious origins, questions arose as to what holiday symbols could appropriately be displayed in the public schools without appearing to endorse religion in violation of the First Amendment. To provide guidance, in 1997, the DOE Office of Legal Services, working in conjunction with the City Office of Corporation Counsel, developed a holiday display policy for the public schools.
 
 
 7
 The iteration of this policy here at issue is that memorialized in virtually identical memoranda dated November 28, 2001, and November 18, 2002, from the Chancellor's general counsel to all City public school superintendents and principals (hereafter referred to collectively as the "Holiday Display Memo").[3] The first paragraph of the Holiday Display Memo states the purpose of the DOE policy:
 
 
 8
 New York City is a diverse multi-cultural community. It is our responsibility as educators to foster mutual understanding and respect for the many beliefs and customs stemming from our community's religious, racial, ethnic and cultural heritage. In furtherance of this goal, we must be cognizant of and sensitive to the special significance of seasonal observances and religious holidays. At the same time, we must be mindful that the Constitution prohibits a school system from endorsing or promoting a particular religion or belief system.
 
 
 9
 Holiday Display Memo at 1. The memorandum proceeds to outline the "guidelines [that] should be followed with respect to the display of cultural/holiday symbols":
 
 
 10
 1. The display of secular holiday symbol decorations is permitted. Such symbols include, but are not limited to, Christmas trees, Menorahs, and the Star and Crescent.
 
 
 11
 2. Holiday displays shall not appear to promote or celebrate any single religion or holiday. Therefore, any symbol or decoration which may be used must be displayed simultaneously with other symbols or decorations reflecting different beliefs or customs.
 
 
 12
 3. All holiday displays should be temporary in nature.
 
 
 13
 4. The primary purpose of all displays shall be to promote the goal of fostering understanding and respect for the rights of all individuals regarding their beliefs, values and customs.
 
 
 14
 Id. (emphasis in original).
 
 
 15
 D. The Catholic League's Challenge to the Holiday Display Policy
 
 
 16
 Soon after the November 2001 dissemination of the Holiday Display Memo, the Catholic League for Religious and Civil Rights unsuccessfully petitioned the DOE to include the crèche in its list of approved symbols for holiday display in the public schools. Skoros submits that she was aware of and in agreement with the Catholic League's efforts and, therefore, did not independently pursue the matter with DOE officials.
 
 
 17
 According to a December 4, 2001 letter from Catholic League President William A. Donohue to then-Chancellor Harold O. Levy, the Chancellor initially denied the League's request to permit the display of a crèche in public schools because he understood the Supreme Court to have "`previously refused to permit erection of a nativity scene on public property.'" Donohue Letter to Levy, Dec. 4, 2001, at 2 (purporting to quote Levy). Donohue submitted that this misconstrued Supreme Court precedent, which only barred a public display of a nativity scene in isolation, not in conjunction with secular holiday symbols. See id. (comparing Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) with County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). Donohue did not assert that the crèche was a secular rather than religious symbol. Instead, he insisted that the right to display religious symbols on public property had been recognized in Capitol Square Review & Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). See Donohue Letter to Levy, Dec. 4, 2001, at 2.
 
 
 18
 In a subsequent letter dated December 14, 2001, Donohue challenged the DOE's characterization of the menorah and the star and crescent as secular symbols and asked for a clarification as to DOE policy regarding nativity scenes: "Are they secular or religious, and can they be displayed in the schools?" Donohue Letter to Levy, Dec. 14, 2001, at 1. The Chancellor's general counsel replied that "[t]he Supreme Court has recognized both the Menorah and Christmas tree as secular symbols of the holiday season. On the other hand, the Supreme Court has found that a nativity scene is not a secular symbol and, therefore, it is unconstitutional to display it on public property." Vignola Letter to Donohue, Dec. 20, 2001, at 1.
 
 
 19
 Over the next several months, Donohue and the Chancellor's general counsel continued to exchange letters debating the relevant case law on holiday displays. In an October 28, 2002 letter, counsel stated that Donohue's reliance on Capitol Square was misplaced because that case concerned the display of a religious symbol in a "public forum," which public schools were not. Vignola Letter to Donohue, Oct. 28, 2002, at 1.[4] Counsel similarly asserted that the Supreme Court's approval of a crèche display in Lynch was limited to the particular facts of that case, which were not translatable to a public school setting. See id. Finally, counsel disputed Donohue's reading of Allegheny. He asserted that the religious symbol there at issue, a menorah, was recognized by the Court to have "both religious and secular dimensions," which was not the case with a crèche, which "is solely a religious symbol." Id. Further, counsel stated that the Supreme Court in Allegheny had "acknowledged that there is no more secular alternative symbol" to represent Chanukah, which the DOE concluded was not the case with Christmas. Id.
 
 
 20
 The net result was that, despite the Catholic League's protest, the DOE continued to disallow crèches from holiday displays in the City public schools.
 
 
 21
 E. The Holiday Displays in the Schools Attended by Skoros's Sons
 
 1. December 2001 — P.S. 165
 
 22
 In December 2001, at which time Nicholas Tine attended P.S. 165, a temporary holiday display in the front lobby of that school included a 1 ½ foot Christmas tree, a one-foot menorah, a similarly sized star and crescent,[5] and a kinara.[6] Red plastic was hung on a lobby wall to make the wall appear to be a large gift box tied with red ribbon. An American flag was affixed to the ribbon, as well as a gift tag stating, "A gift of liberty and justice for all."
 
 2. December 2002 — P.S. 184
 
 23
 In December 2002, at which time Christos Tine attended P.S. 184, a holiday display in that school lobby included a large, "festively decorated Christmas tree," next to which stood a small table "with several dreidels[7] and three paper menorahs, one with a sign stating `Happy Hanukah.'" Skoros v. City of New York, 2004 U.S. Dist. LEXIS 2234, at *7 (footnote added). "[F]ive dreidels and two kinaras" were also displayed on the walls adjacent to the Christmas tree and table. Id. At the rear entrance to P.S. 184, a more modest holiday display had two large snowflakes hanging from the ceiling, while student artwork on the walls depicted six paper Christmas wreaths framing students' written work, four dreidels, and a kinara.
 
 
 24
 Christos's own classroom was decorated with a variety of student art projects. The district court accurately described the display, which is memorialized in a series of photographs, as follows:
 
 
 25
 Hanging by clothespins from a line strung across the classroom are student-created, three-dimensional paper Christmas wreaths and dreidels and at least one drawing of a kinara. Affixed to tables and chairs in the classroom are student-created stockings, with a name on each, presumably the students' names. There is also a paper wreath made of alternating snowmen and Christmas trees topped with a Star of Bethlehem affixed to a wall, as well as a display of snowmen under "A Winter Wonderland" sign.
 
 
 26
 Id. at *8 (internal citations omitted).
 
 
 27
 A calendar for the month of December also hung in the classroom. At the top, it depicted Santa Claus in his sleigh pulled by reindeer. Each day of the month was noted in a cut-out figure of either a snowman, Christmas tree, or dreidel.[8]
 
 
 28
 Skoros alleged that, as one class project, Christos had been required to make a menorah, but the district court found that assertion unsupported by the record. See id. at *13. The evidence indicates that Christos's teacher did give children a Chanukah booklet, with text describing the origin of the dreidel and latkes[9] and black-and-white illustrations, including a cover depiction of a menorah, boldly outlined as in a coloring book. Christos's teacher asked the children to color the booklets, but she did not check to see whether they had done so nor did she display any pictures from the booklets in class. See Dahan Aff. at 2-3. Skoros did not object to the booklet. Indeed, in a letter to Christos's teacher, she stated that she thought her son had done a "fantastic" job coloring the menorah and that she had played the dreidel game with him. Skoros Letter to Dahan, Dec. 9, 2002. She did, however, note that "[a] menorah is a religious symbol," and inquired whether the children would be coloring any religious symbols for Christmas. Id. In response, Christos's teacher advised Skoros that the children had made Christmas wreaths and stockings, which now decorated their classroom. She forwarded a copy of the DOE Holiday Display Memo, noting its focus on secular holiday symbols and its identification of the menorah as a permissible secular symbol. See Dahan Letter to Skoros (undated).
 
 3. December 2002 — P.S. 169
 
 29
 In December 2002, at which time Nicholas Tine attended P.S. 169, that school's holiday decorations included a wall display depicting a row of reindeer with shiny red noses, scattered five-pointed stars, two single candles, gingerbread boys, a Christmas tree, and a dreidel, all beneath a heading stating "Songs, Symbol[s], Signs of the Season." Other walls showed students' written work interspersed with art projects including cotton ball snowmen and brightly colored Santa Claus faces. The Santa display bore a heading stating "Let It Snow!"
 
 
 30
 Yet another wall display highlighted seasonal books and related student artwork. A card referencing the book Rudolph the Red-Nosed Reindeer was placed amidst a herd of cheerful, brown-bag reindeer, with red ball noses, ribbon bowties, and flower-strewn antlers. A card referencing The Gingerbread Baby was placed with brightly colored gingerbread boys and girls dancing under a Christmas tree made from a mass of green-colored cut-outs of children's hand tracings. A card for The Chanukah Guest was placed with paper and stuffed teddy bears sporting bright red scarves and carrying small dreidels in one hand and a frying pan with latkes in the other. Elsewhere in the school, a large snowman sat on a stage atop decorated gift boxes.
 
 
 31
 In the school office, a small decorated Christmas tree shared the counter with a smaller menorah, and, at least for some time, with a bowl of fruit representing Kwanzaa.[10] An office desk, one side of which depicted Santa Claus in his sleigh full of gifts, was festooned with multicolored lights. A red garland and white lights decorated the windows of another school room, while large candy canes, a Santa face, a Kwanzaa sign, and a dreidel hung from the ceiling.
 
 
 32
 In Nicholas's classroom, cards on the wall described four holidays: Kwanzaa, Christmas, Ramadan, and Chanukah.[11]
 
 The Kwanzaa card stated:
 
 33
 Kwanzaa is the holiday when African Americans celebrate their cultural heritage. It was created in 1966 by Dr. Maulana Karenga, an African American who wanted his people to have a special time to celebrate and learn about their cultural origins. Kwanzaa is celebrated from December 26 through January 1. Families and friends gather to remember their ancestors and to enjoy African music, dancing, poetry, and foods. The holiday has seven days, seven symbols, and seven principles. The principles correspond to the seven days of the celebration and serve as guides for daily living.
 
 
 34
 Each night, during Kwanzaa, everyone drinks from the kikombe, or unity cup. The first person who raises the cup says "Harambee," a Swahili word that means "Let's all pull together." What are other symbols of Kwanzaa?
 
 The Christmas card stated:
 
 35
 Christmas, December 25, is the Christian holiday that celebrates the birth of Jesus Christ. This holy time is marked by Nativity scenes, caroling, and church services where Christians hear again the story of the birth of the baby Jesus. Christmas includes many festive customs such as decorating homes and evergreen trees with colored lights, bright ribbons, and shining ornaments. People hang stockings by the fireplace, send Christmas cards to friends near and far, and wrap carefully chosen gifts for their loved ones. The jolly figure of Santa Claus is the bringer of gifts in this happy season.
 
 
 36
 The Christmas tree is one of the many popular symbols of this holiday. People put gifts under the trees after they decorate them with lights and ornaments. What other Christmas symbols can you name?
 
 The Ramadan card stated:
 
 37
 Ramadan, the ninth month of the Muslim calendar, is a holy month for Muslims, believers in the religion Islam. During Ramadan, Muslims fast (take no food or drink) from dawn to sunset. It is a very spiritual time for Muslims. They arise early for a pre-dawn meal. At the end of the day, the fast is broken by taking the Iftar meal, often with friends or family invited into one another's homes. When the new moon appears and the month of Ramadan is over, Muslims celebrate a joyous holiday called Eid-ul-Fitr (Festival of Fast-Breaking). They dress in their best clothing for prayers at the mosque and celebrate with family and friends.
 
 
 38
 On Eid-ul-Fitr, Muslims often visit one another's homes with gifts of sweets, nuts, or coins. The festival is a happy end to the holy month of Ramadan. How is Ramadan like your winter holiday celebrations?
 
 The Chanukah card stated:
 
 39
 Hanukkah is celebrated by Jews in remembrance of a great victory, which won them the right to practice their religion. Also called the Festival of Lights, Hanukkah lasts for eight days because the oil in the Hanukkah story lasted that long. Candles are lit each evening during the eight days of Hanukkah. The candle holder is called a menorah. It holds eight candles and one servant candle, which is used to light the others — one more candle each night of Hanukkah. Some children receive gifts on each of the eight nights of Hanukkah. They play dreidel games and enjoy special Hanukkah foods.
 
 
 40
 Spinning a dreidel, a four-sided top, is a favorite game for children during Hanukkah. The letters on the four sides of the dreidel are the first letters of a Hebrew sentence that means "A great miracle happened there." What is the miracle?
 
 F. District Court Proceedings
 1. Plaintiffs' Complaint
 
 41
 Skoros filed the instant lawsuit on December 29, 2002. In an amended complaint, filed February 28, 2003, she charged that the City's holiday display policy, on its face and as applied by the named defendants, "impermissibly promoted and endorsed the religions of Judaism and Islam, conveyed the impermissible message of disapproval of Christianity, and coerced students to accept the Jewish and Islamic religions in violation of the Establishment Clause of the First Amendment." Am. Compl. at 7, ¶ 22. She further alleged that the defendants had violated the Free Exercise Clause of the First Amendment by coercing her sons "to accept the Jewish and Islamic religions and to renounce [their] Christian religion." Id. at 8, ¶ 25. Finally, she asserted that these actions infringed her own right "to control the religious upbringing and education of her children" in violation of the First and Fourteenth Amendments. Id. at 9, ¶ 28. In relief, Skoros sought (1) a declaratory judgment that the defendants had violated her own and her sons' constitutional rights, as pleaded in the amended complaint; (2) a permanent injunction enjoining defendants from further implementing the challenged holiday display policy in the City's public schools; and (3) an award of nominal damages, attorneys' fees, and costs. See id. at 9-10.
 
 2. The Bench Trial
 
 42
 In October 2003, both sides moved for summary judgment. On December 4, 2003, they withdrew these motions and agreed to have the case tried to the bench on a stipulated record. After reviewing the parties' joint submission, which included numerous affidavits and exhibits, the district court issued a detailed 36-page decision on February 18, 2004, awarding judgment in favor of the defendants. See Skoros v. City of New York, 2004 U.S. Dist. LEXIS 2234.
 
 
 43
 a. The Establishment Clause Claim
 
 
 44
 The district court concluded that Skoros's Establishment Clause challenge failed because the DOE holiday display policy, on its face, satisfied the three-part test established in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971) (requiring challenged action to (1) have a valid secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) avoid excessive state entanglement with religion).
 
 
 45
 The district court found that the stated purpose of the policy was secular: "`to foster mutual understanding and respect for the many beliefs and customs stemming from our community's religious, racial, ethnic and cultural heritage.'" Skoros v. City of New York, 2004 U.S. Dist. LEXIS 2234, at *21 (quoting Holiday Display Memo at 1). To the extent Skoros argued that this purpose statement masked the defendants' true goal to denigrate Christianity by secularizing Christmas and to promote Judaism and Islam, the district court found "no evidence" in the record "to establish such an insidious purpose." Id. at *22. It noted that the Supreme Court had construed the Establishment Clause to "`confin[e] the government's own celebrations of Christmas to the holiday's secular aspects.'" Id. at *26-27 (quoting County of Allegheny v. ACLU, 492 U.S. at 611, 109 S.Ct. 3086). It further concluded that
 
 
 46
 [w]ithout a diversity policy a winter holiday display in New York City's public schools would be dominated by images representative of Christmas.... The DOE policy, permitting the inclusion of symbols of Kwanzaa, Chanukah, and Ramadan in addition to Christmas, is thus an attempt to diversify the season so that children who do not celebrate Christmas can participate in the seasonal celebration and can learn about cultures different from their own without trespassing on their own religious beliefs.
 
 
 47
 Id. at *23-25.
 
 
 48
 At the second step of the Lemon analysis, the district court ruled that the primary effect of the school display policy was secular: "celebrating the diversity of the winter holiday season." Id. at *37. It concluded that no objective observer would perceive the policy's effect to be that asserted by Skoros, that is, an endorsement of Judaism and Islam and a manifestation of hostility toward Christianity.
 
 
 49
 The court specifically found that the DOE had not singled out the crèche for exclusion from school holiday displays. Rather, it excluded all symbols that, like the crèche, were "purely religious." Id. at *35. At the same time, it allowed symbols with religious origins to be used in holiday displays if they had "developed significant secular connotations." Id. at *30. The district court explained that an objective observer would perceive this distinction as reasonable because, when symbols had acquired "significant secular dimensions," a school could more easily use them "in a prudent and objective manner, as a teaching aid" in "the advancement of a secular program of education, and not of religion." Id. at *31. Although the district court made no specific findings with respect to the menorah and the star and crescent, it apparently concluded that these symbols had acquired secular significance. See id. at *33.
 
 
 50
 Finally, the district court concluded that the entanglement prong of the Lemon test required little discussion because the DOE's attempt to design a uniform holiday display policy ensured that it did not need "to police each and every display in every public school year after year." Id. at *38.
 
 
 51
 Insofar as Skoros challenged the DOE holiday display policy as applied to particular displays at the public schools attended by her sons in December 2001 and 2002, the district court ruled that no child, viewing the "dizzying array of holiday symbols" included in the displays, would conclude that the school was endorsing or coercing the practice of "Judaism or Islam over Christianity." Id. at *42-43. Rather, "[t]he context of these holiday displays" satisfactorily "neutraliz[ed] the religious dimensions of the menorah and the star and crescent" so that "a reasonable Christian child ... would not perceive religious endorsement or coercion but `a celebration of the diversity of the holiday season, including traditional religious and secular symbols of that season.'" Id. at *43 (quoting Elewski v. City of Syracuse, 123 F.3d 51, 55 (2d Cir.1997)).
 
 
 52
 b. The Free Exercise Clause Claim
 
 
 53
 The district court also rejected Skoros's Free Exercise claim as without merit. Reiterating that the holiday displays at issue "conveyed an inclusive message, did not advance or promote any particular religion, and did not coerce [Skoros's sons] to reject Christianity," the court concluded that the boys' "passive exposure to and even their participation in the creation of the displays, including symbols from several different religious and cultural holidays, do not interfere with their ability to practice their own faith." Id. at *47-48. It reached the same conclusion with respect to any lessons about the religious origins of any of the holiday symbols displayed, because the "secular manner" in which the evidence indicated they were presented did not interfere with Skoros's sons ability to practice their own faith. Id. at *48.
 
 
 54
 c. The Parental Rights Claim
 
 
 55
 Acknowledging that the First and Fourteenth Amendments afforded Skoros the right to direct the religious upbringing and education of her children, the district court concluded that there was no violation of that right because the evidence simply did not support her claim that defendants sought to coerce her children "to accept the Jewish and Islamic faiths and renounce Christianity." Id. at *49.
 
 II. Discussion
 A. The Standard of Review
 
 56
 On appeal from a bench trial, we generally review a district court's findings of adjudicative fact only for clear error and its conclusions of law, or mixed fact and law, de novo. See Elewski v. City of Syracuse, 123 F.3d 51, 53, 55 (2d Cir.1997) (holding that district court's finding of "a secular purpose for the crèche as part of the entire display... [was] not clearly erroneous"); accord National Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 528 (2d Cir.2004); cf. Lynch v. Donnelly, 465 U.S. 668, 681, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (holding that "[t]he District Court's inference, drawn from the religious nature of the crèche, that the City has no secular purpose was, on this record, clearly erroneous"). Where, as here, a case is tried on a stipulated record, our review is de novo because the district court's rulings are necessarily conclusions of law or mixed fact and law. See General Elec. Co. v. Comm'r, 245 F.3d 149, 154 (2d Cir.2001); accord McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 283 (2d Cir.2004); see also ACLU v. Florissant, 186 F.3d 1095, 1097 (8th Cir.1999) (applying de novo review to holiday display case tried on stipulated record).
 
 
 57
 B. The First Amendment Religion Clauses and Public Displays Incorporating Religious Symbols
 
 
 58
 The First Amendment famously states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I. The dual mandate of these Establishment and Free Exercise Clauses extends to state and local governments through the Fourteenth Amendment. See U.S. Const. amend. XIV; Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ("The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact ... laws [contrary to the First Amendment's religion clauses].").
 
 
 59
 Skoros submits that New York City's holiday display policy for its public schools violates both religion clauses of the First Amendment. In reviewing plaintiffs' claims, we confront the challenge of frequently splintered Supreme Court decisions on the constitutionality of public displays involving religious symbols. Although the Court has never construed the religion clauses to require government "to purge from the public sphere all that in any way partakes of the religious," Van Orden v. Perry, ___ U.S. ___, ___, 125 S.Ct. 2854, 2868, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring in the judgment), its members have rarely agreed — in either analysis or outcome — in distinguishing the permissible from the impermissible public display of symbols having some religious significance.
 
 
 60
 The Supreme Court first addressed the issue of public holiday displays in 1984 in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604. Splitting five to four, the Court held that a crèche displayed in a park together with various secular holiday symbols did not violate the First Amendment. The majority ruled that the purpose and effect of the challenged display could not fairly be determined by focusing only on the crèche. See id. at 679-80, 104 S.Ct. 1355. Rather, the crèche had to be assessed in the context of the overall holiday display, which was reasonably understood to serve the legitimate secular purpose of depicting the origins of a national holiday. See id. at 680-81, 104 S.Ct. 1355.
 
 
 61
 Five years later, in County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472, the Court considered a different holiday display, with a crèche featured in a courthouse lobby, somewhat removed from secular holiday symbols exhibited elsewhere in the building. Once again, the Court divided five to four in holding this display unconstitutional because, "unlike in Lynch, nothing in the context of the [courthouse] display detracts from the crèche's religious message." Id. at 598, 109 S.Ct. 3086.
 
 
 62
 The crèche was not the only religious symbol whose public display was at issue in Allegheny. A First Amendment challenge was also raised to a menorah displayed outside another public building together with a Christmas tree and a sign saluting liberty. On this issue, six justices agreed that the combined menorah-Christmas tree display did not violate the Establishment Clause. This group of six, however, produced three different opinions, none of which commanded a majority of the Court. See id. at 613, 109 S.Ct. 3086 (opinion of Blackmun, J.); id. at 632, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment); id. at 655, 109 S.Ct. 3086 (Kennedy, J., concurring in the judgment in part and dissenting in part). Four justices concluded that passive religious displays, whether of a crèche or a menorah, were constitutionally permissible because they did not compel anyone "to observe or participate in any religious ceremony or activity." Id. at 664, 109 S.Ct. 3086 (Kennedy, J., concurring in the judgment in part and dissenting in part). Both Justice Blackmun and Justice O'Connor, however, insisted that the Establishment Clause reached beyond coercion to prohibit government endorsement of religion. See id. at 619-20, 109 S.Ct. 3086 (opinion of Blackmun, J.); id. at 635-36, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment).[12]
 
 
 63
 While Justices Blackmun and O'Connor recognized the menorah as a religious symbol that could communicate government endorsement of Judaism if displayed by itself, they concluded that the menorah did not convey this impermissible message in the context of the challenged display. See id. at 616 n. 64, 109 S.Ct. 3086 (opinion of Blackmun, J.); id. at 634, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment). For Justice Blackmun, the placement of a menorah "[i]n the shadow of the [Christmas] tree" communicated "a secular celebration of Christmas coupled with an acknowledgment of Chanukah as a contemporaneous alternative tradition." Id. at 617-18, 109 S.Ct. 3086 (opinion of Blackmun, J.). The sign saluting liberty reinforced the display's secular message by "link[ing] that theme with this Nation's legacy of freedom, which allows an American to celebrate the holiday season in whatever way he wishes, religiously or otherwise." Id. at 619, 109 S.Ct. 3086. Further, Justice Blackmun observed that no less religious symbol was reasonably available to represent Chanukah. See id. at 618, 109 S.Ct. 3086 ("An 18-foot dreidel would look out of place [beside a 45-foot Christmas tree] and might be interpreted by some as mocking the celebration of Chanukah."). Justice O'Connor did not think endorsement analysis required consideration of more secular alternatives for a challenged religious symbol. See id. at 636, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment). She concluded simply that "a reasonable observer" of the display would understand that the defendants, by using "a secular symbol of the Christmas holiday season rather than a religious one," together with a religious symbol such as the menorah, were "acknowledg[ing] the cultural diversity of our country" and conveying the permissible secular message of "tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in different ways by our citizens." Id. at 635-36, 109 S.Ct. 3086.
 
 
 64
 The passage of time has not produced greater consensus on the Court in resolving First Amendment challenges to public displays of religious symbols. Last term, ten separate opinions were filed in two cases, one of which held that the Establishment Clause was not violated by a long-standing public display of the Ten Commandments, see Van Orden v. Perry, 125 S.Ct. at 2858 (plurality opinion) (Rehnquist, C.J.); id. at 2864 (Scalia, J., concurring); id. at 2864 (Thomas, J., concurring); id. at 2868 (Breyer, J., concurring in the judgment); id. at 2873 (Stevens, J., dissenting); id. at 2892 (O'Connor, J, dissenting); id. at 2892 (Souter, J., dissenting), and the other of which ruled that the Clause was violated by a different Ten Commandments display with a background of endorsement, see McCreary County v. ACLU, ___ U.S. ___, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005); id. at 2746 (O'Connor, J., concurring); id. at 2748 (Scalia, J., dissenting).
 
 
 65
 Government officials attempting to parse these sharply divided public display decisions might be forgiven for occasionally thinking, as do some of the justices, that they confront a "jurisprudence of minutiae" that leaves them to rely on "little more than intuition and a tape measure" to ensure the constitutionality of public holiday displays. County of Allegheny v. ACLU, 492 U.S. at 674-75, 109 S.Ct. 3086 (Kennedy, J., concurring in the judgment in part and dissenting in part); see also Elewski v. City of Syracuse, 123 F.3d at 57 (Cabranes, J., dissenting) (citing Justice Kennedy's Allegheny opinion in noting challenge of "intensive fact-specific analyses" required in applying endorsement test to holiday display cases); see also ACLU v. Schundler, 168 F.3d 92, 105 (3d Cir.1999) (Alito, J.) (observing that the Supreme Court's religious display decisions "have been marked by fine line-drawing," so that "it is not easy" for public officials "to determine whether particular displays satisfy the Court's standards"). The concern calls to mind Justice Jackson's observation that the metaphorical wall of separation between church and state erected by the Establishment Clause, see 8 The Writings of Thomas Jefferson 113 (H.Washington, ed., 1861), can appear "as winding as the famous serpentine wall" designed by Jefferson for the University of Virginia. Illinois ex rel. McCollum v. Bd. of Educ., 333 U.S. 203, 238, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Jackson, J., concurring); see also Wallace v. Jaffree, 472 U.S. 38, 91-108, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (criticizing "wall" metaphor). No matter. Officials who authorize public holiday displays, like the lower courts that must rule on their constitutionality, are obliged to strive in good faith to identify and apply the principles of law controlling these Supreme Court decisions.
 
 
 66
 Following that mandate, a divided panel of this court, in Kaplan v. City of Burlington, 891 F.2d 1024, 1030 (2d Cir.1989), ruled that a menorah displayed by itself in a public park violated the Establishment Clause. On the other hand, in Elewski v. City of Syracuse, another divided panel concluded that a crèche could constitutionally be displayed in a town square, because a reasonable observer would view that display together with secular holiday decorations on the town's nearby main streets and a menorah in a neighboring square and would perceive the totality of holiday symbols as "a celebration of the diversity of the holiday season, including traditional religious and secular symbols of that season." 123 F.3d at 55. Moreover, the observer would understand the "principal purpose of that celebration [to be] to preserve the economic viability of downtown retailers." Id.
 
 
 67
 With the challenge of our own divided precedent as well as that of the Supreme Court in mind, we now confront the constitutionality of holiday displays in a different and more difficult context: public elementary and secondary schools.
 
 C. Skoros's Establishment Clause Challenge
 
 68
 In addressing Establishment Clause challenges, the Supreme Court has observed that "[t]he First Amendment contains no textual definition of `establishment,'" and that the term itself is "not self-defining." McCreary County v. ACLU, 125 S.Ct. at 2742; see Lemon v. Kurtzman, 403 U.S. at 612, 91 S.Ct. 2105 (describing language of Establishment Clause as "opaque"). Most obviously, the Clause prohibits the establishment of a national or state church, but the Court has never construed its mandate to apply only to this most obvious proscription. See Lemon v. Kurtzman, 403 U.S. at 612, 91 S.Ct. 2105 (observing that a prohibition on laws relating to religion necessarily extends beyond the establishment of a national church); accord McCreary County v. ACLU, 125 S.Ct. at 2742. It has long been accepted that the Establishment Clause prohibits government from officially preferring one religious denomination over another: "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); see McCreary County v. ACLU, 125 S.Ct. at 2733; Gillette v. United States, 401 U.S. 437, 449-50, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Everson v. Bd. of Educ., 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947).
 
 
 69
 Skoros submits that the City's holiday display policy violates this neutrality command by officially promoting and endorsing Judaism and Islam and by conveying disapproval of Christianity. See Am. Compl. at 7, ¶ 22. Like the district court, we find no record support for this argument.
 
 1. The Applicability of the Lemon Test
 
 70
 In identifying the standard of review applicable to Skoros's Establishment Clause challenge, we begin with a preliminary word about "neutrality." In recently reiterating that neutrality is the "touchstone" of First Amendment analysis, McCreary County v. ACLU, 125 S.Ct. at 2733, the Supreme Court noted that the principle provides a "sense of direction" in evaluating the variety of problems that can arise under the Establishment Clause, id. at 2742. Specifically, neutrality serves "to guard against the civic divisiveness that follows when the Government weighs in on one side of religious debate." Id. At the same time, however, the Court acknowledged that, because "neutrality" is a general principal, it "cannot possibly lay every issue to rest, or tell us what issues on the margins are substantial enough for constitutional significance." Id. at 2743; see also Van Orden v. Perry, 125 S.Ct. at 2868-69 (Breyer, J., concurring in the judgment) (observing that "[w]here the Establishment Clause is at issue, tests designed to measure `neutrality' alone are insufficient"); Lee v. Weisman, 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring) ("That government must remain neutral in matters of religion does not foreclose it from ever taking religion into account."). In making this point, McCreary cited approvingly to Justice Harlan's observation that "`neutrality'... is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation" by the First Amendment. McCreary County v. ACLU, 125 S.Ct. at 2743 (quoting Sherbert v. Verner, 374 U.S. 398, 422, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Harlan, J., dissenting)); see also School Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 306, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring) (cautioning that an "untutored devotion to ... neutrality" can lead to "a brooding and pervasive devotion to the secular and a passive, or even active hostility to the religious").
 
 
 71
 Thus, in reviewing Skoros's Establishment Clause claim, we do not test the City's challenged holiday display policy for absolute neutrality. Instead, we apply the three-prong analysis articulated by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105. Lemon instructs that, consistent with the general neutrality objective of the Establishment Clause, government action that interacts with religion (1) "must have a secular ... purpose," (2) must have a "principal or primary effect ... that neither advances nor inhibits religion," and (3) "must not foster an excessive government entanglement with religion." Id. at 612-13, 91 S.Ct. 2105 (internal quotation marks omitted).[13]
 
 
 72
 In applying the Lemon test, we recognize that, in considering the "purpose" prong, we must follow McCreary's recent instructions on the proper scope of purpose analysis. See McCreary County v. ACLU, 125 S.Ct. at 2734-37. Similarly, in reviewing the "effect" of the DOE policy, we heed Justice O'Connor's observation, first advanced in her concurring opinion in Lynch v. Donnelly and subsequently adopted by a majority of the Supreme Court in County of Allegheny v. ACLU, that Lemon's second prong effectively asks whether "the practice under review in fact conveys a message of endorsement or disapproval." Lynch v. Donnelly, 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring) (emphasis added); see County of Allegheny v. ACLU, 492 U.S. at 592-94, 109 S.Ct. 3086 (opinion of Blackmun, J.); see also Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 75 (2d Cir.2001) (recognizing "endorsement" derives from second prong of Lemon).[14] Finally, in reviewing the challenged DOE policy for possible "excessive entanglement" with religion, we are careful to observe the link drawn in Agostini v. Felton, 521 U.S. 203, 232-33, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), between this third prong of Lemon analysis and the second "effect" prong. See Commack Self-Serv., Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 425 (2d Cir.2002).
 
 2. Applying the Lemon Test in this Case
 
 73
 a. Purpose
 
 
 74
 When government action interacts with religion, Lemon instructs that the government purpose must be "secular." Lemon v. Kurtzman, 403 U.S. at 612, 91 S.Ct. 2105. The requirement is not intended to favor the secular over the religious, but to prevent government from "abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).
 
 
 75
 (1) The Policy's Actual Purpose Is Secular
 
 
 76
 (a) The Stated Purpose to Promote Pluralism
 
 
 77
 The purpose of the defendants' challenged policy is plainly stated in the DOE Holiday Display Memo issued to all public schools: holiday displays are to be used "to foster mutual understanding and respect for the many beliefs and customs stemming from our community's religious, racial, ethnic and cultural heritage." Holiday Display Memo at 1. The Memo instructs that "[t]he primary purpose of all [holiday] displays shall be to promote the goal of fostering understanding and respect for the rights of all individuals regarding their beliefs, values and customs." Id. As these statements demonstrate, the purpose of the policy is not simply "to celebrate the secular holiday season," as our dissenting colleague suggests. Post at [45]. Rather, defendants are engaged in a specific pedagogical endeavor: to use children's natural excitement about various year-end holidays to teach the lesson of pluralism by showing children the rich cultural diversity of the city in which they live and by encouraging them to show tolerance and respect for traditions other than their own.[15]
 
 
 78
 Not only is this stated purpose clearly secular; this particular secular purpose is one in which there is a strong public interest. When the Supreme Court, in Board of Education of Kiryas Joel Village School District v. Grumet, 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), ruled that the First Amendment did not permit New York State to create an independent school district for children of the Jewish Satmar sect, Justice Stevens, joined by Justices Blackmun and Ginsburg, observed that what the state could have done to alleviate the fears of Satmar children about attending a broader based public school was to teach students "to be tolerant and respectful of Satmar customs. Action of that kind would raise no constitutional concerns and would further the strong public interest in promoting diversity and understanding in the public schools." Id. at 711, 114 S.Ct. 2481 (Stevens, J., concurring) (emphasis added). Chief Justice Rehnquist and Justices White, Scalia, and Thomas have acknowledged the same public interest, albeit in dissent in Lee v. Weisman: "maintaining respect for the religious observances of others is a fundamental civic virtue that government (including the public schools) can and should cultivate," 505 U.S. at 638, 112 S.Ct. 2649 (Scalia, J., dissenting). Justice O'Connor, in her concurring opinion in Allegheny, has similarly identified "pluralism and freedom of belief" as secular purposes that properly can be promoted in a public holiday display without offending the Establishment Clause. County of Allegheny v. ACLU, 492 U.S. at 635-36, 109 S.Ct. 3086 (O'Connor J., concurring in part and concurring in the judgment) (noting that display combining menorah, Christmas tree, and sign saluting liberty "is an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the winter holiday season is celebrated in diverse ways by our citizens"); see also Walz v. Tax Comm'n, 397 U.S. 664, 689, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Brennan, J., concurring) (rejecting First Amendment challenge to tax exemptions for religious institutions because such organizations "contribute[] to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society").
 
 
 79
 In teaching the lesson of pluralism in New York City public schools, the defendants confront a greater challenge than the one at issue in Kiryas Joel, simply by virtue of the enormous size of the City school system and the extraordinary cultural diversity of its student body. Moreover, because a significant number of New York City schoolchildren or their parents are immigrants, sometimes from countries that place little value on either diversity or tolerance, City schools play a particularly important role in teaching these essential elements of pluralism to future generations of Americans. The fact that they do so, particularly at lower school levels, through cheerful multicultural holiday displays rather than formal textbook assignments, does not diminish the importance of the lesson, much less call into question its actual secular purpose.
 
 
 80
 In sum, because the promotion of tolerance and respect for diverse customs is the clearly stated purpose of the holiday display policy at issue in this case, we conclude that this purpose is permissibly secular.
 
 
 81
 (b) Skoros's Claim that the Policy's Stated Purpose Masks Defendants' Real Goal to Promote Judaism and Islam Over Christianity
 
 
 82
 At the first prong of Lemon analysis, we generally accord "deference" to such a clear government statement of an actual secular purpose provided that the reason is "genuine, not a sham, and not merely secondary to a religious objective." McCreary County v. ACLU, 125 S.Ct. at 2735; see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. at 308, 120 S.Ct. 2266; Edwards v. Aguillard, 482 U.S. at 587, 107 S.Ct. 2573. Skoros asserts that the defendants' stated purpose is not "genuine" because, if they were truly interested in encouraging respect for the diverse traditions of public school students, they would include the crèche in holiday displays and not represent Christmas only through secular symbols. Skoros submits that, by excluding the crèche as a religious symbol and by mischaracterizing the menorah and the star and crescent as secular symbols in order to permit their inclusion in school displays, defendants demonstrate that their actual purpose is not secular pluralism but the endorsement of Judaism and Islam. Like the district court, we reject this argument.
 
 
 83
 Preliminarily, however, we note that we cannot agree with the DOE Memo's characterization of the menorah as a secular symbol. In Kaplan v. City of Burlington, this court specifically identified the menorah as "a religious symbol of the Jewish faith ... recognized as such by the general public." 891 F.2d at 1026. The Supreme Court and our sister circuits agree that the menorah is a religious symbol. See County of Allegheny v. ACLU, 492 U.S. at 613, 109 S.Ct. 3086 (opinion of Blackmun, J.); id. at 633, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment); id. at 643, 109 S.Ct. 3086 (Brennan, J., concurring in part and dissenting in part); ACLU v. Schundler, 168 F.3d at 108; Grossbaum v. Indianapolis-Marion County Bldg. Auth., 63 F.3d 581, 586 (7th Cir.1995).[16] Nevertheless, we find no record evidence to support Skoros's contention that the DOE's characterization was an attempt to mask an impermissible purpose to promote Judaism and Islam or to denigrate Christianity. Rather, the record suggests that the DOE's characterization of the menorah as a secular symbol for purposes of inclusion in school holiday displays originated in a good-faith — if not entirely correct — reading of the Supreme Court's decision in Allegheny.
 
 
 84
 In his letter to Catholic League President Donohue, the Chancellor's general counsel stated:
 
 
 85
 The Allegheny court recognized that while the Menorah has both religious and secular dimensions, it has become the primary visual symbol for the holiday of Hanukkah. Further, the Court acknowledged that there is no more secular alternative symbol to represent Hanukkah. Neither of these factors hold true for the crèche. The crèche is solely a religious symbol and there clearly are other secular alternative symbols of the Christmas holiday.
 
 
 86
 Vignola Letter to Donohue, Oct. 28, 2002, at 1.
 
 
 87
 As we noted earlier, six justices agreed in Allegheny that a menorah displayed together with a Christmas tree and a sign saluting liberty did not violate the Establishment Clause, but no one opinion commanded a majority of the Court on this point. Four justices observed that Chanukah, like Christmas, was a religious holiday that had acquired secular significance. See County of Allegheny v. ACLU, 492 U.S. at 585 & n. 29, 109 S.Ct. 3086 (plurality opinion) (Blackmun, J.); id. at 633, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment). It was Justice Blackmun who, in a footnote, stated that "menorahs — like Chanukah itself — have a secular as well as a religious dimension." Id. at 587 n. 34, 109 S.Ct. 3086 (plurality opinion) (Blackmun, J.). On this point, however, he did not speak for the Court.[17] Indeed, although Justices O'Connor and Stevens joined in this part of Justice Blackmun's opinion, they subsequently joined a majority of their colleagues in faulting Justice Blackmun for attempting to "relegate[] the menorah to the role of a neutral harbinger of the holiday season." Id. at 633, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment) (internal quotation marks omitted); accord id. at 643-44, 109 S.Ct. 3086 (Brennan, J., concurring in part and dissenting in part); id. at 676-78, 109 S.Ct. 3086 (Kennedy, J., concurring in the judgment in part and dissenting in part).
 
 
 88
 To the extent the DOE may mistakenly have understood the Court as a whole to recognize a "secular dimension" for the menorah, we are not persuaded that this error exposes defendants' true purpose to be the promotion of Judaism or Islam in the City's public schools. Rather, we conclude that the interpretive error is attributable simply to the complexity of the opinions in Allegheny and to the DOE's failure carefully to distinguish between those parts of Justice Blackmun's opinion that spoke for a majority of the Court and those that did not.
 
 
 89
 In any event, the significance of any DOE error must not be overstated in evaluating the true purpose of its challenged policy. The DOE's characterization of discrete holiday symbols as secular or religious is not an end in itself but only a means to assist school administrators and teachers in identifying holiday symbols that could permissibly be used to convey the policy's approved secular message of pluralism. The fact that the menorah and perhaps the star and crescent might appropriately be characterized as religious rather than secular symbols does not necessarily indicate that the defendants pursue an unconstitutional purpose.[18] Indeed, last term, the Supreme Court specifically declined to hold "that a sacred text [or symbol] can never be integrated constitutionally into a governmental display" to serve a secular purpose. McCreary County v. ACLU, 125 S.Ct. at 2741. The critical inquiry, as the Court had earlier made plain in the very context of a public school, is whether the religious text or symbol has been sufficiently "integrat[ed] ... into a secular scheme to forestall the broadcast of an otherwise clearly religious message." Id. at 2737-38 (citing Stone v. Graham, 449 U.S. 39, 42, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam) (declaring unconstitutional isolated exhibition of Ten Commandments in school classrooms)); accord Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 76.
 
 
 90
 Allegheny undoubtedly holds that a menorah — although a religious symbol — can constitutionally be integrated into a public holiday display that has a secular rather than religious purpose and effect. This ruling has itself likely contributed to increased inclusion of menorahs in secular holiday displays over the last fifteen years. See, e.g., Mehdi v. United States Postal Serv., 988 F.Supp. 721, 729 (S.D.N.Y.1997) (Sotomayor, J.) (noting that Postal Service policy of displaying decorated evergreen trees and menorahs with other seasonal symbols "was no doubt crafted ... with Allegheny in mind"). Indeed, we can find proof of this trend in the lobby of our own Foley Square courthouse, which is decorated in December with a Christmas tree, numerous poinsettia plants, and a menorah.
 
 
 91
 The DOE policy does not permit the menorah or the star and crescent ever to be used in school holiday displays in isolation, thereby avoiding the problem prompting this court to invalidate a menorah display in Kaplan v. City of Burlington, 891 F.2d at 1030. Indeed, the policy expressly states that "any symbol or decoration which may be used" in a school holiday display "must be displayed simultaneously with other symbols or decorations reflecting different beliefs or customs." Holiday Display Memo at 1 (emphasis added). In light of this requirement, we reject Skoros's claim that the defendants' stated secular purpose is a sham for actual religious endorsement. We conclude that the actual purpose of the challenged policy is as stated by the defendants: to promote pluralism through multicultural holiday displays.
 
 
 92
 (2) An Objective Observer Would Perceive the Policy's Purpose to Be Secular
 
 
 93
 Although the purpose prong of Lemon had long been understood to require courts to inquire only as to "actual purpose," see, e.g., Lynch v. Donnelly, 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring), the Supreme Court has recently instructed that the inquiry must further extend to how the government's purpose is perceived by "an `objective observer,' one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute." McCreary County v. ACLU, 125 S.Ct. at 2734 (internal quotation marks omitted).
 
 
 94
 (a) Identifying the "Objective Observer"
 
 
 95
 It might appear implicit in McCreary's quoted definition that the objective observer is an adult. In Santa Fe Independent School District v. Doe, however, the Supreme Court cast a high school student in this role. See 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (noting that "an objective Santa Fe High School student" would perceive pre-game prayer as stamped with school's approval); see also Board of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 249-52, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (same). We cannot conclude that it makes equal sense to treat a first or second grader as the "objective observer" who can take account of the text, history, and implementation of a challenged policy. Cf. Good News Club v. Milford Cent. Sch., 533 U.S. 98, 115, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("[T]o the extent we consider whether the community would feel coercive pressure to engage in the Club's activities, the relevant community would be the parents, not the elementary school children.") (internal citation omitted). In this case, the children who are the intended audience for the challenged displays vary widely in age, from kindergarten students just learning to read to high school seniors eligible to vote. In these circumstances, we do not assume that the "objective observer" whose perception of purpose is relevant to our analysis is a student because not all such students are sufficiently mature to take full account of the text, history, and implementation of the challenged display policy.[19] Instead, we assume the objective observer is an adult who, in taking full account of the policy's text, history, and implementation, does so mindful that the displays at issue will be viewed primarily by impressionable schoolchildren. See Edwards v. Aguillard, 482 U.S. 578, 583-84, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (noting schoolchildren's impressionability); Lee v. Weisman, 505 U.S. at 597, 112 S.Ct. 2649 (same).
 
 
 96
 Our dissenting colleague disagrees with this identification of the objective observer, a disagreement that carries over into the second prong of Lemon analysis, where the "effect" of the challenged government action has long been tested by reference to a reasonable observer. See Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 75 (collecting cases).[20] He concludes that a court must view the displays from the perspective of (1) "elementary or secondary school students in the New York City public school system," and (2) "parents of such students who experience the displays through and with their children and who have knowledge of the history and context of the policy and displays." Post at [43]. He notes that "we must not lose focus on who is actually the recipient of the message conveyed and how that message will affect such a recipient." Post at [47]. We agree that the intended recipient of a display message is a factor — undoubtedly an important factor — to be considered by the reasonable objective observer whose perceptions determine whether the government acts with a purpose and effect that violates the Establishment Clause, but we do not think the intended recipient of a display necessarily defines the objective observer.
 
 
 97
 In reaching this conclusion, we recognize that the reasonable objective observer standard, like other aspects of the Lemon test, is subject to criticism. Most recently, Justice Thomas faulted the standard for ignoring the fact that persons of faith or of no faith may have stronger concerns about particular government action than the model "reasonable observer." See Van Orden v. Perry, 125 S.Ct. at 2867 (Thomas, J., concurring). Whatever the merits of this criticism, until the Supreme Court rules otherwise, we are not free to discard or recast the reasonable objective observer test in assessing the secular purpose and effect of challenged government action. The Court has made plain that a reasonable objective observer must take full account of "the text, legislative history and implementation of the statute." McCreary County v. ACLU, 125 S.Ct. at 2734 (internal quotation marks omitted). Indeed, Justice O'Connor insisted on this characterization in a case arising in the context of a public elementary school, Elk Grove Unified School District v. Newdow, 542 U.S. 1, 34, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring in the judgment). In rejecting an Establishment Clause challenge by the father of a kindergarten child to a school policy providing for the voluntary recital of the Pledge of Allegiance, Justice O'Connor described the relevant reasonable objective observer as a person "fully cognizant of the history, ubiquity, and context of the practice in question." Id. at 40, 124 S.Ct. 2301. She concluded that "[s]uch an observer could not conclude that reciting the Pledge, including the phrase `under God,' constitutes an instance of worship." Id. (emphasis added). Thus, because, as even the dissent appears to recognize, see post at [____], young schoolchildren cannot satisfy the requirements of an objective observer recently specified by the Supreme Court in McCreary, we conclude that such children cannot provide the model of the objective observer for purposes of Lemon analysis in this case.
 
 
 98
 Nor does Supreme Court precedent appear to contemplate multiple reasonable objective observers, for example, persons who believe in God as distinct from those who do not; child observers as distinct from adult observers; or, as the dissent suggests, children who practice Judaism or Islam as distinct from other children. See post at [51, 55-56] (concluding that Jewish and Muslim students would think the challenged displays endorsed Judaism and Islam). As Justice O'Connor has explained, the reasonable observer standard does not "focus on the actual perception of individual observers, who naturally have differing degrees of knowledge." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. at 779, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment). Instead, the standard strives to identify "a personification of a community ideal of reasonable behavior determined by the collective social judgment." Id. at 780, 115 S.Ct. 2440 (alteration and internal quotation marks omitted).
 
 
 99
 Mindful of this goal, we do not attempt to cast schoolchildren of widely varying ages and religious backgrounds in the role of one or more reasonable objective observers. At the same time, however, we do not turn a "blind eye" to the fact that schoolchildren are the intended audience for the challenged displays, as the dissent suggests. See post at [42]. We reiterate that we expect that a mature reasonable objective observer, in noting the "context of the community and forum" in which the challenged holiday displays appear, would take into consideration that schoolchildren are the intended audience for the displays, that these children are being reared in a variety of faiths (as well as none), and that, by virtue of their ages, they may be especially susceptible to any religious messages conveyed by such displays.[21]
 
 
 100
 With this understanding of the objective-observer standard, we consider how two facts could affect such an observer's perception of the defendants' asserted secular purpose: (1) defendants' allowance of the menorah and the star and crescent in school holiday displays, and (2) their disallowance of the crèche.
 
 
 101
 (b) Defendants' Integration of the Menorah and the Star and Crescent in School Holiday Displays Communicates a Secular Purpose
 
 
 102
 As already noted, defendants do not permit the menorah, the star and crescent, or any holiday symbol to be used in isolation in school holiday displays. See Holiday Display Memo at 1 ("[A]ny symbol or decoration which may be used must be displayed simultaneously with other symbols or decorations reflecting different beliefs or customs"). The record evidence of holiday displays in P.S. 165, P.S. 169, and P.S. 184, detailed in our earlier discussion of the facts, see supra at [7-10], amply demonstrates that these instructions are, in fact, implemented by City schools in creating multicultural holiday displays. Thus, when menorahs or stars and crescents are displayed, their religious significance is appropriately neutralized by myriad accompanying symbols of other winter holidays having nonreligious as well as religious origins.[22] As a result, no objective observer of the displays in evidence would understand the defendants' purpose to be other than that stated in the Holiday Display Memo, that is, to promote schoolchildren's understanding and respect for the many cultural traditions celebrated in New York City during the winter holiday season. Certainly, no objective observer would understand the purpose of the displays to be the endorsement or promotion of Judaism or Islam or the denigration of Christianity, as alleged by the plaintiff. See County of Allegheny v. ACLU, 492 U.S. at 635-36, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment); Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. at 711, 114 S.Ct. 2481 (Stevens, J., concurring) (observing that "no constitutional concerns" arise from school efforts to teach children about minority religious customs in order to promote respect and tolerance); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 631, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (distinguishing between permissibly educating students as to meaning of flag salute and impermissibly compelling them to "declare a belief" by performing the salute).
 
 
 103
 Our dissenting colleague nevertheless concludes otherwise. He submits that, because a Jewish or Muslim child knows the religious significance of a menorah or star and crescent, such a child would perceive the defendants' real intent to be to endorse Judaism and Islam over Christianity. See post at [51, 55-56]. We cannot agree with this conclusion, which finds no support in the record. Certainly, no trial evidence was adduced in this case showing the effect of the challenged holiday displays on any child, much less an effect on Jewish and Muslim children leading them to think that school officials favored their religions over Christianity. Cf. McCreary v. Stone, 739 F.2d 716, 727 (2d Cir.1984) (declining to speculate that crèche display affected children differently from adults in the absence of record evidence), aff'd by an equally divided court sub nom., Board of Trustees of Village of Scarsdale v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985) (per curiam).
 
 
 104
 The dissent submits that no evidence is necessary on this point because the question of "`whether a government activity communicates endorsement of religion is ... in large part a legal question to be answered on the basis of judicial interpretation of social facts.'" Post at [56] (quoting Lynch v. Donnelly, 465 U.S. at 693-94, 104 S.Ct. 1355 (O'Connor, J., concurring)). In any event, it submits that no evidence supports our conclusion that an objective adult observer would perceive the purpose and effect of the challenged displays as secular. We disagree.
 
 
 105
 First, we note that the conclusion we reach today is supported by both law and evidence, specifically, (1) by Allegheny's recognition that a menorah displayed with secular holiday symbols can reasonably be understood to convey to an objective observer "a message of pluralism and freedom of belief during the holiday season," not a message to Jews (or Muslims) that their religion is officially endorsed, 492 U.S. at 635-36, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment); and (2) by record evidence that the challenged holiday display policy, as stated and implemented, comports with Allegheny by prohibiting the celebration of any single holiday in school displays and by requiring any holiday symbol to be displayed in conjunction with "other symbols or decorations reflecting different beliefs or customs." Holiday Display Memo at 1. Indeed, we have discussed the actual displays in such detail, see supra at [7-10], precisely because we think it apparent that they pass constitutional muster under Allegheny.
 
 
 106
 Second, Justice O'Connor's cited observation in Lynch implies that no specific evidence is necessary to allow judges to determine how a mature objective mind would process the images and information conveyed by a holiday display. See Lynch v. Donnelly, 465 U.S. at 693-94, 104 S.Ct. 1355 (O'Connor, J., concurring); see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. at 40, 124 S.Ct. 2301 (O'Connor, J., concurring in the judgment) (reviewing Establishment Clause challenge in school context by reference to mature objective observer, not schoolchild). But when the issue is whether an immature mind would process the same information differently, some evidence on that point may well be necessary to permit a judge to conclude, as the dissent does here, that displays that would communicate pluralism to an objective adult would communicate religious endorsement to a Jewish or Muslim child.
 
 
 107
 Further, the conclusion urged by the dissent as to the impact the challenged displays would have on Jewish and Muslim children is by no means the obvious "judicial interpretation of [the] social facts" here at issue. See Lynch v. Donnelly, 465 U.S. at 693-94, 104 S.Ct. 1355 (O'Connor, J., concurring). It requires a court to assume not only that young Jewish and Muslim children recognize the religious significance of their own Chanukah and Ramadan symbols, but also that these children are sufficiently sophisticated in Christian iconography to understand that the myriad Christmas symbols included in school holiday displays lack religious significance. Absent some supporting evidence, however, it makes equal sense to conclude that young Jewish and Muslim children understand Christmas symbols simply as signs of a holiday celebrated primarily by the nation's Christian majority. In that context, a young Jewish child seeing a menorah or a Muslim child seeing a star and crescent included in the multicultural holiday displays in evidence in this case, would simply conclude that his beliefs and traditions are as respected as those of any other group, not that they are favored or officially endorsed. Thus, on the trial record developed in this case, we have no reason to conclude that the Supreme Court's decision in Allegheny about the pluralistic message conveyed by the inclusion of a menorah (or a star and crescent) in a multicultural holiday display applies with any lesser force when such a display appears in a public school rather than a public park.
 
 
 108
 (c) Defendants' Decision to Represent Christmas in School Holiday Displays Through Secular Symbols Does Not Demonstrate a Purpose Hostile to Christianity
 
 
 109
 No different conclusion is warranted by the defendants' decision not to permit a crèche or nativity scene to represent Christmas in school holiday displays. Indeed, Justice O'Connor's concurring opinion in Allegheny concluded that the government's decision to use secular symbols to represent Christmas in a multicultural holiday display that used a menorah to represent Chanukah confirmed that the real purpose of the display was to communicate pluralism rather than to endorse religion, whether Judaism or Christianity. See County of Allegheny v. ACLU, 492 U.S. at 636, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment); see also Elewski v. City of Syracuse, 123 F.3d at 58 (Cabranes, J., dissenting) (noting that "secular context and a message of pluralism" was what "enabled the menorah/Christmas tree display in Allegheny to survive constitutional scrutiny").
 
 
 110
 As we noted at the outset of this opinion, we do not here decide whether there are any circumstances in which the defendants could constitutionally include a crèche in a public school holiday display. Nor do we ignore the possibility that, in some circumstances, a government's deliberate exclusion of the religious symbol of one faith from a display that includes the religious symbols of other faiths could communicate the official favoritism or hostility among religious sects that is prohibited by the Establishment Clause. See generally School Dist. of Abington Twp. v. Schempp, 374 U.S. at 305, 83 S.Ct. 1560 (Goldberg, J., concurring) (noting that government must "effect no favoritism among sects"); accord Van Orden v. Perry, 125 S.Ct. at 2868 (Breyer J., concurring in the judgment). We hold only that where, as in this case, defendants permissibly include a religious symbol in a holiday display that unquestionably serves the secular purpose of pluralism, the Establishment Clause does not necessarily demand that they employ a religious symbol for every holiday that has a religious as well as a secular component.
 
 
 111
 This court has recognized that when "government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause." Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d 469, 476 (2d Cir.1999); see Walz v. Tax Comm'n, 397 U.S. at 669, 90 S.Ct. 1409 (observing that, short of "governmentally established religion or governmental interference with religion," the First Amendment allows some "room for play in the joints productive of a benevolent neutrality"); see also Locke v. Davey, 540 U.S. 712, 718, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (reiterating Walz's recognition of "room for play in the joints"). In this case, the Chancellor's general counsel, in an affidavit submitted to the district court, explained that, to ensure compliance with the Establishment Clause, the DOE's holiday display policy seeks to avoid the use of any holiday symbols that depict deities. See Vignola Aff. at 5, ¶ 16. A nativity scene undoubtedly qualifies as the depiction of a deity, with the infant Jesus usually being worshiped as God-made-man by adoring angels, shepherds, and wise men. While a menorah is understood to commemorate a miracle performed by God, it does not itself depict a deity. Nor does the star and crescent. This is not to suggest that the menorah (or the star and crescent) is a less religious symbol than the crèche. See Allegheny County v. ACLU, 492 U.S. at 633-34, 109 S.Ct. 3086 (O'Connor, J. concurring in part and concurring in the judgment) (recognizing menorah as "the central religious symbol and ritual object" of Chanukah, which, like the crèche, could convey a message of endorsement when standing alone).[23] It simply recognizes that the crèche conveys its religious message more representationally and less symbolically than the menorah and the star and crescent. For this reason, the religious significance of a crèche may be more obvious to the average schoolchild than that of the menorah and the star and crescent. Thus, whether or not the defendants' exclusion of the crèche is constitutionally mandated, an objective observer would recognize that the distinction drawn by the Chancellor's counsel reflects a sincere "effort to avoid transgressing Establishment Clause limits," Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d at 476, and not a religious purpose to endorse Judaism or Islam.
 
 
 112
 Indeed, that conclusion is reinforced by the fact that the Christian holiday of Christmas is well represented in the City's school holiday displays through a variety of well recognized and beloved symbols, including the Christmas tree, Santa Claus, reindeer, candy canes, gingerbread boys and girls, tinsel garlands, strings of lights, not to mention Christmas wreaths, candles, stars, and presents.[24] To the extent these Christmas symbols shared classroom, lobby, and hall space with snowmen, snowflakes, menorahs, dreidels, kinaras, and, on one occasion, a star and crescent, no objective observer would understand defendants' purpose to be to denigrate Christianity. Indeed, that argument is conclusively refuted by the instructional cards used by the defendants in some elementary school classrooms. See supra at [9-10]. As our earlier quotation of the text of these cards demonstrates, they afford equally respectful treatment to the religious origins of Christmas, Chanukah, and Ramadan, as well as the secular origins of Kwanzaa. The Christmas card even alludes to the Christian tradition of erecting nativity scenes.
 
 
 113
 In sum, even if the DOE erred in characterizing the menorah and the star and crescent as "secular" symbols, and whether or not the DOE is correct in its assessment that the crèche would be more difficult than the menorah or the star and crescent to incorporate into a secular holiday display in New York City public schools, no reasonable objective observer would perceive from the totality of the circumstances in this case that the purpose of the challenged display policy was, in fact, to communicate to City schoolchildren any official endorsement of Judaism and Islam or any dismissal of Christianity. Accordingly, we conclude, as did the district court, that the defendants satisfy the first prong of the Lemon test because the actual and perceived purpose of the DOE holiday display policy is secular: to use holiday celebrations to encourage respect for the City's diverse cultural traditions.
 
 
 114
 In the next section of this opinion, we consider whether, despite this secular purpose, the DOE holiday display policy nevertheless has the impermissible effect of endorsing Judaism or Islam or inhibiting the practice of Christianity.
 
 
 115
 b. Primary Effect
 
 
 116
 The second prong of the Lemon test mandates that the "principal or primary effect" of the challenged government action "must neither advance nor inhibit religion." Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d at 430. When applied to holiday display challenges, this analysis is "highly fact-specific," asking: "Would a reasonable observer of the display in its particular context perceive a message of governmental endorsement or sponsorship of religion?" Elewski v. City of Syracuse, 123 F.3d at 53 (emphasis added); accord Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 75.
 
 
 117
 (1) The Endorsement Test
 
 
 118
 As Justice O'Connor, the principal architect of the "endorsement test," explained in Allegheny, the concept of endorsement is not limited to government coercion or efforts at proselytization; it is intended to take account of "the numerous more subtle ways that government can show favoritism to particular beliefs or convey a message of disapproval to others." 492 U.S. at 627-28, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment).[25] The endorsement test does not require courts to "sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens." Id. at 623, 109 S.Ct. 3086; see id. at 631, 109 S.Ct. 3086 ("[G]overnment can acknowledge the role of religion in our society in numerous ways that do not amount to an endorsement." (emphasis in original)). Rather, it seeks to ensure that government does "not make a person's religious beliefs relevant to his or her standing in the political community," id. at 627, 109 S.Ct. 3086, thereby sending "a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community," Lynch v. Donnelly, 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring).
 
 
 119
 Like the "objective observer" whose perception of purpose is at issue at the first step of Lemon analysis, the "reasonable observer" employed in the endorsement test, see Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 75 (collecting cases), is not a particular individual, but "`a personification of a community ideal of reasonable behavior,'" Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. at 780, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment) (quoting W. Keeton, et. al., Prosser and Keeton on Law of Torts 175 (5th ed.1984)). A court reviewing an Establishment Clause challenge to a particular holiday display is not required to ask "whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think [the State] endorses religion.'" Id. (quoting Americans United for Separation of Church and State v. Grand Rapids, 980 F.2d 1538, 1544 (6th Cir.1992) (en banc) (emphasis in original)). Rather, it considers whether a "reasonable observer ... aware of the history and context of the community and forum in which the religious display appears," would understand it to endorse religion or, in this case, one religion over another. Id.; see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. at 40, 124 S.Ct. 2301 (O'Connor, J., concurring in the judgment).
 
 
 120
 (2) Applying Endorsement Analysis to Public Schools
 
 
 121
 When, as in this case, we apply endorsement analysis to a policy that operates throughout a city's public elementary and secondary schools, special concerns arise in the identification of a reasonable observer. As we noted in discussing a similar ideal observer whose perception of purpose was relevant at step one of the Lemon analysis, it makes no sense at the effect step to view a kindergarten child or first grader as someone "fully cognizant of the history, ubiquity, and context of the practice in question," Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. at 40, 124 S.Ct. 2301 (O'Connor, J., concurring in the judgment), even if certain high school students may fit this description, see Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. at 308, 120 S.Ct. 2266. Because of the range of the students to whom the challenged display policy applies, we conclude that the relevant objective observer, whether with respect to purpose or effect, is an adult who is "aware of the history and context of the community and forum in which the religious display appears," Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. at 780, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment), and who understands that the display of a religious symbol in a school context may raise particular endorsement concerns, because of the pressure exerted on children by the "law of imitation," Illinois ex rel. McCollum v. Bd. of Educ., 333 U.S. at 227, 68 S.Ct. 461 (Frankfurter, J, concurring) (observing that "nonconformity is not an outstanding characteristic of children").[26]
 
 
 122
 The latter concerns do not mean that the Constitution prohibits public schools from making any mention of religion when teaching a secular lesson about pluralism and tolerance. See Stone v. Graham, 449 U.S. at 42, 101 S.Ct. 192 (recognizing that Bible may be used "in an appropriate study of civilization, ethics, comparative religion, or the like"); School Dist. of Abington Twp. v. Schempp, 374 U.S. at 225, 83 S.Ct. 1560 (recognizing Bible as "worthy of study for its literary and historic qualities ... as part of a secular program of education"); accord Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 76. As Justice Jackson observed, if that were the rule, "public education [would be left] in shreds."
 
 
 123
 Music without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view.... Certainly a course in English literature that omitted the Bible and other powerful uses of our mother tongue for religious ends would be pretty barren. And I should suppose it is a proper, if not an indispensable, part of preparation for a worldly life to know the roles that religion and religions have played in the tragic story of mankind. The fact is that, for good or for ill, nearly everything in our culture worth transmitting, everything which gives meaning to life, is saturated with religious influences, derived from paganism, Judaism, Christianity — both Catholic and Protestant — and other faiths accepted by a large part of the world's peoples. One can hardly respect a system of education that would leave the student wholly ignorant of the currents of religious thought that move the world society for a part in which he is being prepared.
 
 
 124
 Illinois ex rel. McCollum v. Bd. of Educ., 333 U.S. at 235-36, 68 S.Ct. 461 (Jackson, J., concurring); see also Edwards v. Aguillard, 482 U.S. at 607, 608 n. 8, 107 S.Ct. 2573 (Powell, J., concurring) (noting that "since religion permeates our history, a familiarity with the nature of religious beliefs is necessary to understand many historical as well as contemporary events," citing "political controversies in Northern Ireland, the Middle East and India" as examples of world events that "cannot be understood properly without reference to the underlying religious beliefs and the conflicts they tend to generate"). Where the Supreme Court has demanded vigilance is in ensuring that public schools do not appear to endorse religious creed and do not employ religious rituals and ceremonies in school activities. See, e.g., School Dist. of Abington Twp. v. Schempp, 374 U.S. at 226-27, 83 S.Ct. 1560 (declaring daily prayer in public school unconstitutional); see also Lee v. Weisman, 505 U.S. at 598-99, 112 S.Ct. 2649; Stone v. Graham, 449 U.S. at 42-43, 101 S.Ct. 192; Lemon v. Kurtzman, 403 U.S. at 619, 91 S.Ct. 2105.
 
 
 125
 (3) The DOE Holiday Display Policy Does Not Endorse or Inhibit Religion
 
 
 126
 In applying these principles to this case, it is important to note that the challenge at issue does not concern a single public display, as in most cases that have come before the courts. See, e.g., McCreary County v. ACLU, ___ U.S. ___, 125 S.Ct. 2722, 162 L.Ed.2d 729; County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472; Elewski v. City of Syracuse, 123 F.3d 51. Rather, its focus is a policy intended to ensure that thousands of holiday displays created annually for New York City's public school classrooms, hallways, and lobbies comport with the First Amendment's religion clauses. The displays are obviously all on public property and are publicly funded. Further, the schoolchildren for whose benefit these displays are created have no option but to view them and, sometimes, to participate in the craft projects that are integral to many of the displays.[27] Having carefully reviewed the record, we nevertheless conclude, as the district court did, that a reasonable observer would not understand the challenged holiday display policy, either on its face or as applied, to endorse Judaism or Islam or to communicate to children who practice either of those faiths that they are favored members of their school and civic communities, while communicating to Christian children or others that they are somehow inferior.
 
 
 127
 As previously noted in our discussion of purpose, the challenged DOE policy specifically states that no school display may appear to promote any single religion or holiday. The record evidence demonstrates that this directive is carefully observed in the City schools. The photographic exhibits confirm the district court's finding that defendants' 2001-2002 holiday displays afforded City schoolchildren a "dizzying array" of seasonal symbols, Skoros v. City of New York, 2004 U.S. Dist. LEXIS 2234, at *42, allowing each student to find some familiar symbol (whether a Christmas tree, a menorah, a kinara, a star and crescent, or simply a cheerful snowman or lacy snowflake) with which to identify, while at the same time exposing the child to less familiar symbols from which he could learn about cultures and traditions different from his own. Of the various holiday symbols depicted in the display photos, the menorah (and perhaps the star and crescent) might appear to a reasonable adult observer to have the most religious significance. But such an objective observer would readily perceive from the instructional cards used in certain classrooms that the defendants treated the religious and secular origins of all winter holidays celebrated in school displays with equal respect. More important, the observer would see that the menorah and the star and crescent, when used in holiday displays, always shared space with a multitude of secular symbols so that even the youngest elementary schoolchild would understand that the message being conveyed was not the endorsement of Judaism or Islam but a recognition of the diversity of winter holiday celebrations among different cultures. See Van Orden v. Perry, 125 S.Ct. at 2869 (Breyer, J., concurring in the judgment) (emphasizing that, whether a religious text or symbol conveys a religious or secular message requires court to "examine how the text [or symbol] is used" in the context of the display) (emphasis in original); County of Allegheny v. ACLU, 492 U.S. at 635, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment) (concluding that menorah displayed with Christmas tree and sign saluting liberty "did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season"); Elewski v. City of Syracuse, 123 F.3d at 55 (holding that reasonable observer would perceive crèche in context of overall holiday decorations not as an endorsement of Christianity but as a "celebration of the diversity of the holiday season"). In short, an objective observer would conclude that the effect of displaying the menorah and star and crescent, together with Christmas trees, Christmas wreaths, candles, stars, kinaras, snowmen and a host of other holiday symbols in integrated holiday displays was simply to familiarize schoolchildren with the fact that all these symbols are used by certain members of the community to celebrate holidays at the end of the calendar year, that the various traditions reflected in these holidays are entitled to everyone's respect, and that the diversity of these traditions enriches the community for all members. Nothing in the record would indicate to an objective observer that the effect of displaying the menorah and the star and crescent would be "to induce the schoolchildren ... to venerate" these objects or to accept the religious creeds of Judaism and Islam as officially endorsed by the state. See Stone v. Graham, 449 U.S. at 42, 101 S.Ct. 192.
 
 
 128
 To the extent our dissenting colleague concludes that Jewish and Muslim children would understand the holiday displays to favor their religions over Christianity, we reject that conclusion for reasons already noted in our discussion of purpose, see supra at [24-25]; specifically, it has no support in the record and, therefore, is at odds with County of Allegheny v. ACLU, 492 U.S. at 635, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment). We simply cannot agree that a Jewish or Muslim child who saw menorahs and stars and crescents included in December holiday displays that invariably also showed Christmas trees, Christmas stars, Christmas candles, Christmas stockings, Christmas lights, and Christmas wreaths, would be apt to conclude that school officials favored his religion over Christianity.
 
 
 129
 We expect that the real Establishment Clause challenge for the defendants in developing the holiday display policy at issue was not that Jews and Muslims would infer from the inclusion of a few menorahs or stars and crescents amidst a panoply of Christmas symbols that their particular religions were favored by the state, but that nonbelievers might infer from the celebration of three holidays with religious significance that the state generally favored religion. It is obvious both from the stated holiday display policy and the trial evidence demonstrating its implementation that the defendants have been conscientious in signaling otherwise: celebrating Kwanzaa and the winter season generally along with Christmas, Chanukah, and Ramadan; focusing generally on the secular aspects of the religious holidays; and limiting holiday symbols with religious significance to those that did not depict a deity and, in the case of the menorah, had come to achieve general public recognition as the accepted symbol of the Chanukah holiday in multicultural holiday displays. As a result of these efforts, we can conclude, as the district court did, that any reasonable objective observer would perceive the effect of DOE holiday displays, even on young schoolchildren, to be a celebration of pluralism, not an endorsement, general or specific, of religion.
 
 
 130
 Whether the secular message of respect for diverse cultures could be conveyed as effectively without use of the menorah or the star and crescent is not constitutionally significant. See Lynch v. Donnelly, 465 U.S. at 682 n. 7, 104 S.Ct. 1355 (rejecting as "irrelevant" dissenters' argument that city's secular objectives could have been achieved without including crèche in holiday display); accord County of Allegheny v. ACLU, 492 U.S. at 635-36, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment) (noting that endorsement conclusion did not depend on whether city had a more secular alternative to the menorah to represent Chanukah). An objective observer, seeing that school displays included menorahs together with kinaras and Christmas candles (among many other holiday symbols) would reasonably conclude that the message of pluralism was being conveyed to young children simply by showing them that different traditions, whether religious or not, lit candles, sometimes in special candelabra (Chanukah and Kwanzaa), sometimes as a single light (Christmas), to celebrate holidays. The very fact that the Kwanzaa candelabrum has no religious significance would allow schools to use it together with the menorah to communicate this secular message without risk of religious endorsement. See id. at 635-36, 109 S.Ct. 3086 (observing that use of Christmas tree, a secular symbol, together with menorah confirmed that the message conveyed by the display was pluralism, not endorsement of religion). School displays further communicated a message of diversity and tolerance by showing children the gift-giving traditions and special food customs that were common features of various winter holiday celebrations. In sum, any reasonable observer would readily appreciate from the diverse holiday displays created pursuant to the DOE policy that no symbol was employed to endorse or denigrate any religious belief. Rather, the displays acknowledged the rich cultural diversity of New York City, permitting all children to feel included in some way in the holiday season while simultaneously teaching all children to understand and respect traditions and cultures different from their own.
 
 
 131
 The fact that the crèche might, in some contexts, also be used to communicate this secular message of pluralism, see Lynch v. Donnelly, 465 U.S. at 680-81, 104 S.Ct. 1355; Elewski v. City of Syracuse, 123 F.3d at 55, does not mean that a reasonable observer would interpret the defendants' decision not to include this particular Christmas symbol as a sign of disapproval of Christianity. As we indicated in our discussion of purpose, we afford the government some leeway in policing itself to avoid Establishment Clause issues, even if it thereby imposes limits that go beyond those required by the Constitution. See Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d at 476; see also Locke v. Davey, 540 U.S. at 718, 124 S.Ct. 1307; Walz v. Tax Comm'n, 397 U.S. at 669, 90 S.Ct. 1409. We presume that a reasonable observer, "aware of the history and context of the community and forum in which the religious displays appears," Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. at 780, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment), would recognize this fact as well as the considerable litigation that, perhaps unfortunately, appears to be routinely triggered by public crèche displays. He would know that, at the same time that many devout Christians use crèches to commemorate the religious miracle of Christmas, these Christians and countless nonbelievers also share in the numerous secular traditions of the Christmas holiday, including the decoration of Christmas trees. He presumably would know that the Supreme Court had approved a holiday display in which Christmas was represented by a Christmas tree and Chanukah by a menorah to convey the permissible secular message of pluralism. He would recognize that menorahs had increasingly come to be used together with Christmas trees in secular public holiday displays throughout the City. Mindful of these circumstances, a reasonable observer would not think that a decision to disallow the crèche from school holiday displays but to recognize Christmas with a Christmas tree and a host of other secular symbols for this holiday signaled disapproval of the Christian religion or government endorsement of religion, whether generally or specifically.[28]
 
 
 132
 Accordingly, we conclude that the defendant's holiday display policy, both as stated and as applied, satisfies the second "effect" or "endorsement" prong of the Lemon test.
 
 
 133
 c. Entanglement
 
 
 134
 The final prong of the Lemon test considers whether the challenged government action "foster[s] excessive state entanglement with religion." Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d at 425. Skoros submits that the defendants impermissibly entangle the public schools with religion when they attempt to categorize holiday symbols as secular or religious. While it might be preferable for the defendants to abandon this endeavor, particularly in light of their mischaracterization of the menorah (and possibly the star and crescent) as secular, we do not agree that such characterizations involve an excessive entanglement of church and state, when as here, they are made by government officials regulating only their own speech and when religious officials play no role in the government's holiday display decisions.
 
 
 135
 "Entanglement is a question of kind and degree." Lynch v. Donnelly, 465 U.S. at 684, 104 S.Ct. 1355. As the Supreme Court explained in Agostini v. Felton, 521 U.S. at 232-33, 117 S.Ct. 1997, the First Amendment does not prohibit all interaction between church and state. The entanglement of the two becomes constitutionally "excessive" only when it has "the effect of advancing or inhibiting religion." Id. at 233, 117 S.Ct. 1997. Thus, entanglement analysis is properly treated as "an aspect" of Lemon's second-prong "inquiry into a statute's effect." Id.; Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d at 425. The factors relevant to determining excessive entanglement are "similar" to the factors used to determine effect; a court considers "`the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" Agostini v. Felton, 521 U.S. at 232, 117 S.Ct. 1997 (quoting Lemon v. Kurtzman, 403 U.S. at 615, 91 S.Ct. 2105). Applying these principles to this case, we note that the policy at issue affects only a public institution, the City's public schools. It provides no government benefit or aid to any religious institution or group. Nor does it affect the relationship between church and state by affording the former a role in defining legal standards or obligations. Rather, the policy provides guidance only to city employees in creating and installing holiday displays in public schools.
 
 
 136
 (1) Defendants' Actions Limit Only Government Speech
 
 
 137
 In characterizing certain holiday symbols as "secular," the defendants do not entangle church and state because their conclusions have no effect on private speech, either within a sectarian institution or a public forum. See Good News Club v. Milford Cent. Sch., 533 U.S. at 106-07, 121 S.Ct. 2093 (holding that, in allowing school facilities to be used as a limited public forum for non-school functions, defendant could not discriminate against activities with religious viewpoint); see also Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. at 392-93, 113 S.Ct. 2141 (same). Defendants' characterizations serve to discipline only their own speech to ensure that it conveys a permissible secular message and does not appear to endorse religion, either generally or specifically.
 
 
 138
 As the Supreme Court has recognized, there is a "crucial difference" between government and private speech that endorses religion: while the former is forbidden by the Establishment Clause, the latter is protected by the Free Speech and Free Exercise Clauses. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. at 765 (plurality opinion) (rejecting First Amendment challenge to Ku Klux Klan display of a cross in an area deemed a public forum); see id. at 774, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment). Thus, if the government were to attempt to define the secular and the religious as they affect a private organization, the government might well violate the First Amendment by entangling itself in religion through pervasive monitoring of private speech. See Good News Club v. Milford Cent. Sch., 533 U.S. at 127, 121 S.Ct. 2093 (Scalia, J., concurring) (noting that, even if government were competent to distinguish between the secular and the religious, "the distinction would require state monitoring of private, religious speech with a degree of pervasiveness that we have previously found unacceptable"); cf. Walz v. Tax Comm'n, 397 U.S. at 698, 90 S.Ct. 1409 (Harlan, J., concurring) (explaining that tax exemption for religious properties was constitutional because "its administration need not entangle government in difficult classifications of what is or is not religious for any [private] organization").
 
 
 139
 This was the precise concern in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, in which Rhode Island proposed to provide financial support for the non-sectarian curriculum of parochial schools. The Supreme Court declared the law unconstitutional, noting that the state would be required to entangle itself with religion by conducting "comprehensive, discriminating and continuing surveillance" in the parochial schools to ensure that teachers in such institutions did not inject religion into their secular classes. Id. at 619, 91 S.Ct. 2105. It would also have to inspect and evaluate parochial school records "to determine how much of the total expenditures is attributable to secular education and how much to religious activity." Lemon v. Kurtzman, 403 U.S. at 620, 91 S.Ct. 2105. Thus, the law effectively "place[d] the State astride a sectarian school and [gave] it power to dictate [to the religious institution] what is or is not secular, what is or is not religious." Id. at 637, 91 S.Ct. 2105 (Douglas, J., concurring).
 
 
 140
 This case involves no such state monitoring of non-government activities. The defendants do not attempt to inject state authority into any sectarian institution or to dictate to any private group or person outside the public schools any official view of what are the secular or religious symbols of particular holidays. The challenged DOE policy operates exclusively within public schools. Thus, to the extent the DOE must monitor the operation of its display policy within these schools, there is no entanglement concern because "with regard to restrictions the State must place on its own speech [to avoid endorsement], pervasive state monitoring is unproblematic." Good News Club v. Milford Cent. Sch., 533 U.S. at 127 n. 3, 121 S.Ct. 2093 (Scalia, J., concurring). In any event, as the district court correctly observed, it is not the DOE's one-time characterization of the menorah and the star and crescent as secular symbols that requires constant monitoring. Rather, it is the ability of over a thousand City public schools to use these symbols, however characterized, in holiday displays without appearing to promote religion. See generally Agostini v. Felton, 521 U.S. at 232-33, 117 S.Ct. 1997 (linking entanglement and effect inquiries); cf. Lee v. Weisman, 505 U.S. at 616-17, 112 S.Ct. 2649 (Souter, J., concurring) (questioning Court's competence to distinguish between the sectarian and the ecumenical in concluding that any prayer at graduation appears to endorse religion). For reasons already discussed in the immediately preceding section of this opinion, we conclude that, even if the DOE has mischaracterized the menorah and the star and crescent as secular symbols, it has satisfactorily ensured that these symbols are integrated into holiday displays so as to convey only a secular message of pluralism. City schools do not display these symbols to endorse or inhibit religion.
 
 
 141
 (2) The DOE Policy Does Not Cede Government Authority to a Sectarian Group or Take Sides in a Religious Dispute
 
 
 142
 Just as the DOE policy does not entangle church and state by insinuating government authority into any private religious institutions, nor does it do so by ceding government authority to any religious sect or group. See Larkin v. Grendel's Den, Inc., 459 U.S. 116, 127, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982) (observing that test for entanglement is whether government practice would "enmesh churches in the processes of government"). That concern prompted this court to invalidate New York's kosher fraud laws in Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F.3d 415. There we explained that, by defining "kosher" by reference to "orthodox Hebrew religious requirements," id. at 423 (quoting New York statutes), and by creating an Advisory Board of Orthodox rabbis to consult with state enforcement authorities, New York had
 
 
 143
 excessively entangle[d] government and religion [by] (1) tak[ing] sides in a religious matter, effectively discriminating in favor of the Orthodox Hebrew view of dietary requirements; (2) require[d] the State to take an official position on religious doctrine; and (3) create[d] an impermissible fusion of governmental and religious functions by delegating civic authority to individuals apparently chosen according to religious criteria.
 
 
 144
 Id. at 425. None of those concerns arises in this case.
 
 
 145
 With respect to the first two concerns, there is no doctrinal religious dispute here at issue on which New York City has taken sides or stated an official position so as to affect the expectations or rights of any religious groups. The DOE characterization of the menorah and the star and crescent as secular symbols operates only internally to guide public school authorities in creating permissibly secular holiday displays. Public school officials are routinely required to evaluate the secular significance of various works of literature, art, and philosophy in designing curricula. A decision to characterize Dante and Milton as secular rather than religious poets might be debatable among theologians, but such a DOE choice would raise no establishment concern unless the purpose and effect of teaching the Inferno or Paradise Lost was religious rather than literary. So in this case, the constitutionality of the DOE's decision to allow the menorah and the star and crescent to be used in school holiday displays does not depend on the accuracy of its characterization of these symbols as secular, but on the plainly secular purpose and effect of its holiday display policy. To the extent the defendants characterize the crèche differently from the menorah and the star and crescent and do not permit its inclusion in school holiday displays, that choice risks some "political divisiveness," as evidenced by this lawsuit. But the Supreme Court has made clear that this factor, by itself, is "insufficient... to create an `excessive' entanglement." Agostini v. Felton, 521 U.S. at 233-34, 117 S.Ct. 1997. A plaintiff must demonstrate that the government's challenged action advances or inhibits religion, see id. at 233, 117 S.Ct. 1997, a contention we have already rejected.
 
 
 146
 As for the final concern noted in Commack, the record indicates no fusion of government and religious authority. The challenged holiday display policy was created and has always been implemented entirely by public employees pursuing a secular purpose. There is no history of religious authorities playing any role in determining what holiday symbols may be used in public school displays. Cf. McCreary v. ACLU, 125 S.Ct. at 2741, 125 S.Ct. 2722 (invalidating Ten Commandments display where background evidence demonstrated history of religious purpose).
 
 
 147
 In sum, because the DOE holiday display policy does not involve excessive entanglement by government authorities intruding into religious affairs or religious authorities intruding into civic affairs, we conclude that it satisfies the final prong of Lemon analysis. Accordingly, like the district court, we conclude that Skoros's Establishment Clause challenge to the DOE's holiday display policy is appropriately rejected as without merit.
 
 D. Skoros's Free Exercise Clause Challenge
 
 148
 Skoros asserts that, through holiday displays that secularized Christianity and promoted Judaism and Islam, the defendants "coerced" her children "to accept the Jewish and Islamic religions and to renounce [their] Christian religion." Am. Compl. at 8, ¶ 25. This Free Exercise claim is, in fact, simply a variation on Skoros's Establishment Clause challenge and, as such, requires less detailed discussion.
 
 
 149
 The Free Exercise Clause of the First Amendment embraces two concepts: "freedom to believe and freedom to act" on one's beliefs. Cantwell v. Connecticut, 310 U.S. at 303, 60 S.Ct. 900. The former freedom, which "forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship," is absolute; "in the nature of things, the second cannot be." Id. at 303-04, 60 S.Ct. 900; see Employment Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 877-79, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 79. For reasons already discussed in some detail, we conclude that the record in this case fails to demonstrate that the purpose of the defendants' challenged actions was to impugn Skoros's children's religious beliefs or to restrict their religious practices. Absent such an objective, a Free Exercise claim will be sustained only if the "government has placed a substantial burden on the observation of a central religious belief," without "a compelling governmental interest justif[ying] the burden." Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 384-85, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (internal quotation marks omitted); accord Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 79.
 
 
 150
 Skoros asserts that the defendants' holiday display policy substantially burdened her children's practice of their faith by recognizing and celebrating only the secular aspects of Christmas, while ignoring the holiday's religious significance. Skoros fails to demonstrate how such an exclusively secular focus would have burdened her children's ability to practice their faith. In any event, the evidence shows that the defendants did not completely ignore the religious significance of Christmas. In pursuing the secular purpose to promote respect for a variety of traditions and cultures, the DOE provided schools with instructional cards that described the origins — secular and religious — of all holidays represented in public school displays, including Christmas. While Skoros might think it helpful to her own efforts to rear her children as Catholics for the public schools to go further and to reinforce the religious message of her faith through holiday displays focusing on the religious rather than secular aspects of Christmas, the defendants' failure to do so cannot be ruled a violation of the Free Exercise Clause. Just as government may not compel any person to adopt a prescribed religious belief or form of worship, no person may "require the Government itself to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." Bowen v. Roy, 476 U.S. 693, 699-700, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (emphasis in original) ("The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."). In Allegheny, the Supreme Court specifically ruled "that government may celebrate Christmas in some manner and form, but not in a way that endorses Christian doctrine." 492 U.S. at 601, 109 S.Ct. 3086. Accordingly, we conclude that, even if religious symbols of Christmas might be included in a secular holiday display without violating the Establishment Clause, there is no merit to Skoros's claim that the defendants must include such symbols to avoid violating the Free Exercise rights of Christian students.
 
 
 151
 With an equal lack of specificity or record evidence, Skoros submits that the defendants also burdened her children's practice of their religious faith by including the menorah and the star and crescent in school holiday displays. As a Free Exercise challenge, this argument is foreclosed by our decision in Altman v. Bedford Central School District, 245 F.3d 49. In Altman, plaintiffs asserted that a public school Earth Day celebration placed a substantial burden on the practice of the core religious beliefs of Catholicism in that a faculty member's "criticism of overpopulation of the Earth" could reasonably be construed to advocate birth control. Id. at 80. In rejecting this argument, this court observed that "[t]he mere evidence that plaintiffs found that remark and perhaps some other aspects of the ceremonies offensive to their beliefs ... did not suffice to prove a free exercise violation, for the court made no finding that students were required to participate in the Earth Day ceremonies." Id.
 
 
 152
 In the district court, Skoros sought to distinguish her case from Altman by asserting that her son, Christos, had in fact been required to make a menorah. While we recognize the menorah as a religious symbol, we find no record support for the conclusion that it was ever used by the defendants, either in a holiday display or craft project, to communicate a religious message or as part of a religious ritual.[29] The evidence shows only that Christos was given a booklet about Chanukah, with various pictures, including a cover design of a menorah, that could be colored. We need not decide whether Christos, a second grader, understood a difference between being "asked" or "assigned" to color the booklet. Even if coloring the booklet was an assignment, Skoros's letter to her son's teacher does not suggest any burden on her child's observance of his own faith. In praising her son's coloring of the menorah and reporting that she had played a dreidel game with him, Skoros made no complaint. She inquired only as to whether children would also be coloring religious symbols of Christmas. The fact that Skoros offered in evidence a nativity scene from a children's coloring book demonstrates how easily Christian parents could supplement school holiday craft projects with ones placing greater emphasis on the particular religious beliefs that they wish to instill in their children. In sum, there is no basis for her claim that defendant's actions encouraged her son to renounce Christianity.
 
 
 153
 In reaching this conclusion, we reiterate the point made in our earlier discussion of Skoros's Establishment Clause challenge: defendants "used" the menorah in holiday display projects not to promote Judaism but to teach children about diverse cultures and traditions through a common theme of celebration. See Van Orden v. Perry, 125 S.Ct. at 2869 (Breyer, J., concurring in the judgment). In pursuit of this secular purpose, on one day, the children in a particular class might have been asked to color menorahs, but on other days, those same children participated in making Christmas wreaths, Christmas stockings, kinaras, snowmen, snowflakes, and a host of other holiday symbols. Precisely because the menorah was being used together with such a broad array of holiday symbols for a secular pedagogical purpose, the challenged coloring assignment no more burdened the Free Exercise rights of a Catholic child than would a high school literature assignment that used an excerpt from the Old Testament rather than the New Testament, or the King James version of the Bible rather than the Vulgate. Accordingly, we reject Skoros's Free Exercise challenge as without merit.
 
 E. Parental Rights
 
 154
 Skoros submits that the defendants' actions in promoting Judaism and Islam and denigrating Christianity violate her parental rights to control the religious upbringing and education of her children. We conclude that, in this case, Skoros has no parental right claim independent of the Establishment and Free Exercise claims that we have already rejected as without merit.
 
 
 155
 In Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Supreme Court recognized a parental right, derived from the First and Fourteenth Amendments, to control the religious upbringing of children. This right permits parents to educate their children outside the public schools, despite compulsory school attendance laws. See Wisconsin v. Yoder, 406 U.S. at 221-28, 92 S.Ct. 1526; see also Runyon v. McCrary, 427 U.S. 160, 177, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). In Leebaert v. Harrington, however, this court ruled that this precedent affords parents no "fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children." 332 F.3d 134, 141 (2d Cir.2003) (internal quotation marks omitted); see also Stein v. Oshinsky, 348 F.2d 999, 1002 (2d Cir.1965) (Friendly, J.) (concluding that school authorities' decision not to permit student-initiated prayers in public schools against the desire of some parents did not violate constitutional rights of free exercise of religion and freedom of speech).
 
 
 156
 In Leebaert, a parent sued to have his son excused from attending a health program mandated by state law on the grounds that its curriculum with respect to sexuality was at odds with the religious beliefs in which he was rearing his child. 332 F.3d at 141. Skoros submits that her case is distinguishable from Leebaert because her challenge pertains not to a single class but to "the entire public school learning environment for Christians." Appellant's Br. at 53 n. 20. We find this distinction unconvincing because the broad spectrum of public education issues is generally "committed to the control of state and local authorities." Goss v. Lopez, 419 U.S. 565, 578, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (internal quotation marks omitted). Certainly, public school authorities cannot devise curricula or rules that violate the Establishment or Free Exercise Clauses but, where, as in this case, no such violation is established, a parent cannot invoke a separate "fundamental right ... to tell a public school what his or her child will and will not be taught." Leebaert v. Harrington, 332 F.3d at 141 (collecting cases); see also Blau v. Fort Thomas Pub. Sch. Dist., 401 F.3d 381, 395-96 (6th Cir.2005) (holding that "[w]hile parents may have a fundamental right to decide whether to send their child to a public school, they do not have a fundamental right to direct how a public school teaches their child") (emphasis in original).
 
 
 157
 Like the district court, we conclude that Skoros fails to establish a claim for any violation of her parental rights.
 
 III. Conclusion
 
 158
 To summarize, we conclude that New York City's holiday display policy, both on its face and as applied by the defendants, comports with the Establishment and Free Exercise Clauses of the First Amendment and does not violate a parent's right to control the religious upbringing and education of her children.
 
 
 159
 With respect to Establishment, we apply the three-part test outlined in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, and conclude:
 
 
 160
 1. The holiday display policy serves a secular purpose: teaching pluralism by celebrating the City's rich cultural diversity and by encouraging schoolchildren to show respect and tolerance for traditions other than their own.
 
 
 161
 2. Although the policy mischaracterizes the menorah as a secular symbol, the policy nevertheless adequately ensures that the menorah is displayed in public schools only with a variety of other holiday symbols to promote pluralism and tolerance, not to endorse religion. The same conclusion applies to the policy's treatment of the star and crescent.
 
 
 162
 3. Because the City's secular characterizations of the menorah and the star and crescent discipline only government speech with no government authorities intruding into religious affairs and no religious authorities intruding into civic affairs, the display policy involves no excessive entanglement of church and state.
 
 
 163
 We hold that no different conclusion is dictated by the City's decision not to allow the crèche to represent Christmas in public school holiday displays. We do not here decide whether the City could, consistent with the Constitution, include a crèche in its school holiday displays. We conclude only that the defendants do not violate the Establishment Clause when, in pursuing the secular goal of promoting respect for the City's diverse cultural traditions, they represent Christmas through a variety of well recognized secular symbols at the same time that they represent Chanukah through the menorah and Ramadan through the star and crescent.
 
 
 164
 With respect to Free Exercise, we conclude that no record evidence supports Skoros's claim that the City's holiday display policy coerced her children to embrace Judaism or Islam or to renounce their Catholic faith.
 
 
 165
 Finally, because the City policy does not violate the Establishment and Free Exercise Clauses, we conclude that it does not impinge Skoros's right to control the religious upbringing and education of her children.
 
 
 166
 The February 20, 2004 judgment of the district court in favor of the defendants is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 To facilitate our discussion of Skoros's appeal, we briefly describe the three symbols at issue:
 
 
 [1]
 Themenorah is a nine-branch candelabrum associated with Chanukah (sometimes spelled Hanukkah or Hanukah), a Jewish holiday, usually falling in December, that commemorates the Maccabees' triumph over the Seleucid Empire and the rededication of the Temple of Jerusalem. The menorah is used to celebrate a miracle connected to the Temple rededication whereby one day's supply of oil miraculously lasted for eight days. See County of Allegheny v. ACLU, 492 U.S. 573, 583, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (plurality opinion) (Blackmun, J.,) (collecting sources). On each of the eight nights of Chanukah, the Jewish community lights a new branch of the menorah (with a candle, the shammash, held in a ninth branch) "to celebrate the miracle of a continuously burning light." Kaplan v. City of Burlington, 891 F.2d 1024, 1026 (2d Cir.1989).
 
 
 [2]
 Thestar and crescent is a symbol of Islam sometimes associated with the sighting of the new moon at the start and finish of the holy month of Ramadan, a time of concentrated fasting, worship, and acts of charity. See Gordon D. Newby, A Concise Encyclopedia of Islam, "Hilal," 81 (2002); see also The Oxford Dictionary of Islam, "Hilal," 113 (John L. Esposito ed., 2003) (noting sighting of crescent moon as important for determination of when certain Islamic religious practices must take place); Oxford Dictionary of World Religions, "Crescent moon," 246 (John Bowker ed., 1997) (observing that Quran recognizes the waning of the moon "as a sign of God's unchanging purpose and control"). Ramadan takes place during the ninth lunar month of the Muslim year. In 2001-2002, the years here at issue, Ramadan fell during November and December.
 
 
 [3]
 Thecrèche or nativity scene is a visual depiction of Christ's birth in Bethlehem as recounted in the gospels. See Luke 2:1-21; Matthew 2:1-11. Generally, a crèche depicts Mary, Joseph, and the infant Jesus within a stable or cave setting, frequently surrounded by adoring shepherds, magi, angels, and animals. See Webster's Third New International Dictionary (Unabridged) 532 (1993). The Christmas crèche tradition is often attributed to St. Francis of Assisi. See Lynch v. Donnelly, 465 U.S. 668, 724, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (Brennan, J., dissenting) (collecting sources). A crèche installed each December in the Metropolitan Museum of Art's medieval sculpture hall is among New York City's noteworthy holiday traditions. See Linn Howard, et. al., The Angel Tree: A Christmas Celebration (1994).
 
 
 [2]
 Kwanzaa, which, in Swahili, means "first fruits of the harvest," is a nonreligious holiday created in 1966 to celebrate African-American family and social values. On each of Kwanzaa's seven days, from December 26 to January 1, families gather to exchange gifts and to discuss particular principles: unity, self-determination, collective responsibility, operative economics, purpose, creativity, and faith. On December 31, communities join together for a "karamu," or feastSee 7 New Encyclopedia Britannica, "Kwanzaa," 54-55 (15th ed.1998); Eric V. Copage, A World of Celebration; New York City: Kwanzaa, N.Y. Times, Nov. 8, 1998, § 6, at 10.
 
 
 [3]
 The Holiday Display Memo deals only with seasonal displays, not with classroom instruction or religious expression by students in the school. The latter issue is the subject of a separate DOE Regulation, which is part of the record but not at issue in this case
 
 
 [4]
 At issue inCapitol Square was a cross erected by the Ku Klux Klan. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. at 758, 115 S.Ct. 2440.
 
 
 [5]
 This appears to be the only display of the star and crescent in evidence in this case
 
 
 [6]
 A kinara is a seven-branched candelabrum that is lit during Kwanzaa. The colors of the candles — three red, three green, and one black — represent, for example, self-determination, collective work and responsibility, and unitySee 7 New Encyclopedia Britannica, "Kwanzaa," 55; Antoinette Broussard, African-American Holiday Traditions 142-43 (2000).
 
 
 [7]
 A dreidel is a spinning top with four sides, each of which is inscribed with a different Hebrew letter. Together the letters abbreviate a sentence that refers to the Chanukah miracle. During Chanukah, it is customary for Jewish children to use the dreidel to play a game of chance with money ("gelt") that they receive as a holiday giftSee County of Allegheny v. ACLU, 492 U.S. at 585, 109 S.Ct. 3086 (plurality opinion) (Blackmun, J.) (collecting sources).
 
 
 [8]
 Skoros complains that the calendar square for December 25, Christmas day, depicted the date in a dreidel. The calendar did not link particular holidays to particular dates and no evidence was adduced indicating that the use of a dreidel on December 25 was a product of anything other than the random placement of the three symbols used to decorate the calendar. Thus, December 24, Christmas Eve, was marked with a Christmas tree, and December 26, the first day of Kwanzaa, with a snowman. The dates December 1 through 6, coinciding with the last six days of Chanukah, were depicted using all three symbols
 
 
 [9]
 Latkes are potato pancakes customarily served during Chanukah because the oil in which they are fried serves as a reminder of the miracle of oil associated with ChanukahSee County of Allegheny v. ACLU, 492 U.S. at 585 n. 26, 109 S.Ct. 3086 (plurality opinion) (Blackmun, J.) (citing M. Strassfeld, The Jewish Holidays 168 (1985)).
 
 
 [10]
 Although Skoros asserts that this menorah was placed in the office window and lit, the school principal denies the assertionSee Kunin Aff. at 2.
 
 
 [11]
 The record does not indicate whether these cards were also displayed in other classrooms, but that inference appears reasonable given that the items are a published teaching aid rather than the creation of an individual teacher. In any event, the card display establishes that the challenged DOE policy did not preclude respectful verbal acknowledgments of the religious origins of certain winter holidays or of the fact that nativity scenes are used by some persons in celebrating Christmas
 
 
 [12]
 In analyzing the crèche display inAllegheny, a majority of the Court adopted the endorsement test, which "precludes government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." County of Allegheny v. ACLU, 492 U.S. at 593, 109 S.Ct. 3086 (internal quotation marks and alteration omitted).
 
 
 [13]
 TheLemon test has been much criticized over its twenty-five year history. See, e.g., McCreary County v. ACLU, 125 S.Ct. at 2757-58 (Scalia, J., dissenting) (criticizing heightened purpose test); Van Orden v. Perry, 125 S.Ct. at 2867 (Thomas, J., concurring) (faulting reliance on "unusually informed observer"); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 397-401, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J, concurring in the judgment) (cataloguing cases in which justices have rejected Lemon test); County of Allegheny v. ACLU, 492 U.S. at 655, 109 S.Ct. 3086 (Kennedy J., concurring in the judgment in part and dissenting in part) (criticizing endorsement test). Nevertheless, the Supreme Court has never specifically disavowed Lemon's analytic framework. See, e.g., McCreary County v. ACLU, 125 S.Ct. at 2733 (expanding on Lemon's purpose prong in reviewing specific Ten Commandments display); Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (holding that Lemon analysis appropriately applies to facial challenges under the Establishment Clause); cf. Van Orden v. Perry, 125 S.Ct. at 2860-61 (acknowledging possible continued viability of Lemon test, but finding it "not useful" in reviewing constitutionality of the passive monument display in that case). This court has regularly relied on Lemon in evaluating Establishment Clause challenges and only recently reiterated that "the Lemon test continues to govern our analysis of Establishment Clause claims." Peck v. Baldwinsville Cent. Sch. Dist., 426 F.3d 617, 634 (2d Cir.2005); see Commack Self-Serv. Kosher Meats, Inc. v. Weiss, 294 F.3d 415, 425 (2d Cir.2002) (applying Lemon test in assessing First Amendment challenge to New York's kosher fraud laws); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 75 (2d Cir.2001) (applying Lemon test to Establishment Clause challenge to Earth Day celebration). We are, of course, required to respect this precedent until it is reconsidered by this court sitting en banc or is rejected by a later Supreme Court decision. See Monsanto v. United States, 348 F.3d 345, 351 (2d Cir.2003). Accordingly, we apply Lemon analysis to Skoros's Establishment Clause challenge.
 
 
 [14]
 To the extent this court previously suggested indictum that an as-applied Establishment Clause challenge might be resolved by reference only to "endorsement" in cases challenging government displays of religious imagery, see generally DeStefano v. Emergency Hous. Group, 247 F.3d 397, 411 (2d Cir.2001), that possibility now seems foreclosed by McCreary County v. ACLU, which emphasized the importance of a "purpose" inquiry in evaluating a particular Ten Commandments display, 125 S.Ct. at 2733-37.
 
 
 [15]
 We cannot agree with the dissent that the challenged policy, as stated or implemented, is "directed" at having schoolchildren "utilize[] religious symbols of certain religions," while "ban[ning] the religious symbols of another." Post at [42] (emphasis added). In fact, the policy strives to minimize the use of religious symbols to avoid Establishment Clause concerns. To the extent it approves the use of the menorah and the star and crescent in holiday displays, that decision appears to have been reached only after defendants determined that Chanukah and Ramadan could not reasonably be represented without these symbols and that such symbols could be incorporated into secular holiday displays celebrating pluralism. See infra at [21-22 & n. 18]. While federal courts must decide de novo the merits of defendants' incorporation conclusion, nothing in the record indicates that the policy is in any way "directed" at having schoolchildren utilize certain religious symbols qua religious symbols.
 
 
 [16]
 For purposes of this appeal, we assume that the star and crescent is also a religious rather than a secular symbol, although arguments apparently can be raised to the contrarySee Mehdi v. United States Postal Serv., 988 F.Supp. 721, 723 (S.D.N.Y.1997) (suing unsuccessfully to display the star and crescent, a "secular symbol of the Muslim people," in United States post offices when Christmas trees and menorahs are used in holiday displays); see also 8 Encyclopedia Americana, "Crescent," 175 (int'l ed.2002) (noting original secular significance of crescent symbol); 7 Encyclopedia of Religion, "Islamic Iconography," 66 (Mircea Eliade ed., 1987) (explaining that crescent's early appearance on Islamic coins and metalwork had no religious connotations).
 
 
 [17]
 Justice Blackmun'sAllegheny opinion, 492 U.S. at 578, 109 S.Ct. 3086, demands careful reading because parts III-A, IV, and V (holding that courthouse crèche display violated Establishment Clause) do represent a clear holding of the Court. As for the remainder of his opinion, parts I (containing the cited excerpt) and II were joined by Justices Stevens and O'Connor; part III-B was joined by Justice Stevens; and part VII was joined by Justice O'Connor. In Part VI of the opinion, in which Justice Blackmun concluded that the menorah/Christmas tree display did not violate the Establishment Clause, Justice Blackmun spoke only for himself.
 
 
 [18]
 The DOE's characterization of the star and crescent as a permissible secular symbol for school holiday displays apparently resulted from its settlement of a lawsuit filed by the same plaintiff as inMehdi v. United States Postal Service, 988 F.Supp. 721. See supra at n. 16. In an affidavit to the district court in this case, the Chancellor's general counsel explained that, in connection with that earlier suit, the City's Corporation Counsel "consulted with several experts who indicated that the star and crescent, which appears on the flags of some countries that have large Muslim populations but have secular governments, has a secular dimension, ... was not originally derived from the Quran and is also considered a political or cultural symbol." Vignola Aff. at 7, ¶ 22. Accordingly, the Board settled the lawsuit by agreeing "that schools would be permitted, but not required, to display the star and crescent with other permitted symbols." Id. These circumstances would not indicate to an objective observer that defendant's real purpose in allowing the display of the star and crescent is to promote the Islamic religion or to inhibit the practice of Christianity.
 
 
 [19]
 We note that the trial evidence in this case focuses on the application of the challenged holiday display policy in elementary schools. There is no evidence as to the application of the policy in high schools
 
 
 [20]
 There appears to be no difference in the Supreme Court's characterization of an "objective observer" and a "reasonable observer" at the first two stages ofLemon analysis. Compare McCreary County v. ACLU, 125 S.Ct. at 2734 with Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. at 779-80, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment). Thus, in this opinion we use the terms interchangeably and our reasoning in identifying the objective observer relevant to purpose analysis applies equally to identifying the observer relevant to effect analysis.
 
 
 [21]
 In the context of discrimination cases, where there is some tension in our case law as to whether a "reasonable person" standard references a member of the protected class or the public at large,see Petrosino v. Bell Atlantic, 385 F.3d 210, 221-222 (2d Cir.2004) (comparing cases), Judge Newman has suggested that a reasonable person should be someone informed of "how members of the protected class regard the challenged remarks or displays," Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 321 (2d Cir.1999) (Newman, J., concurring in part and dissenting in part). The same expectation is reasonably applied to reasonable observer analysis in the context of Establishment Clause challenges.
 
 
 [22]
 For this reason, we cannot agree with the dissent that the menorah or star and crescent displays at issue in this case present an endorsement concern akin to that identified inFox v. City of Los Angeles, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867 (1978), a case in which an illuminated Latin cross was displayed in isolation on the face of the Los Angeles city hall at Easter time. See post at [51-52].
 
 
 [23]
 We need not — and therefore do not — attempt to determine the relative religious significance of the menorah, the star and crescent, or the crèche to Judaism, Islam, and Christianity. To the extent the dissent ascribes any such conclusion to the court,see post at [50], it is mistaken. Our concern is not the religious significance of these symbols to particular faiths, but the symbols' perceived endorsement of religion, generally or specifically, in the context of the challenged school holiday display policy.
 
 
 [24]
 Some of these Christmas holiday symbols have or have had religious connotations. For example, the Christmas star that tops many Christmas trees recalls the star of Bethlehem that announced Christ's birth to the MagiSee Matthew 2:2. Christmas presents evoke the gifts of gold, frankincense, and myrrh given to Christ by the Magi. See Matthew 2:11. Christmas candles represent Christ as a light coming into a world of darkness. See John 1:5. As for Santa Claus, he was Saint Nicholas before Thomas Nast and Clement Moore replaced his bishop's miter and crozier with a sack full of toys and a team of reindeer. All these items are now widely accepted as secular symbols of a holiday that is celebrated even by people of no faith.
 
 
 [25]
 InCapitol Square Review & Advisory Board v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650, members of the Court divided on the question of whether endorsement analysis was properly applied only to government speech, compare id. at 763-70, 115 S.Ct. 2440 (plurality opinion) (Scalia, J.) (concluding that endorsement test should be limited to government speech or discrimination) with id. at 786-92, 115 S.Ct. 2440 (Souter, J., concurring in part and concurring in the judgment) (rejecting plurality's view of scope of endorsement test). We need not address this issue because the parties do not contest that the challenged actions here at issue represent government speech.
 
 
 [26]
 In a number of cases, the Supreme Court has noted that Establishment Clause analysis can yield different results depending on whether challenged conduct occurs within a public school or in some other settingCompare Stone v. Graham, 449 U.S. at 42-43, 101 S.Ct. 192 (holding unconstitutional state law requiring Ten Commandments to be posted in every public school classroom) with Van Orden v. Perry, 125 S.Ct. at 2864 (rejecting constitutional challenge to Ten Commandments display on state capitol grounds); compare also Lee v. Weisman, 505 U.S. at 598-99, 112 S.Ct. 2649 (holding prayer at secondary school graduation to be unconstitutional) with Marsh v. Chambers, 463 U.S. 783, 793-95, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (upholding prayer in state legislature). See also County of Allegheny v. ACLU, 492 U.S. at 620 n. 69, 109 S.Ct. 3086 (opinion of Blackmun, J.) (noting that combined Christmas tree and menorah display "might raise additional constitutional considerations" if display were "located in a public school").
 
 
 [27]
 Because Skoros did not ask to have her children excused from any project or assignment relating to a holiday originating in a religious tradition other than her own, we have no occasion to consider whether a school would have to honor such a request when the purpose of the project — to teach cultural diversity — comported with the First AmendmentCf. West Virginia Bd. of Educ. v. Barnette, 319 U.S. at 631, 63 S.Ct. 1178 (distinguishing between school permissibly making students "acquainted with the flag salute so that they may be informed as to what it is or even what it means" and unconstitutionally compelling students "to declare a belief" by performing the salute); Leebaert v. Harrington, 332 F.3d 134, 140-42 (2d Cir.2003) (rejecting claim of parental right to have son excused from school health course that conflicted with parent's religious beliefs regarding morality: parental right to decide not to send child to public school did not encompass a right to dictate the curriculum at the public school to which the parent did send the child). Plainly, defendants could not devise a holiday project that required a child to participate in a religious ritual. See, e.g., Lee v. Weisman, 505 U.S. at 598-99, 112 S.Ct. 2649 (holding that requiring students to stand for graduation prayer constituted compelled participation in religious ritual); accord Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. at 312, 120 S.Ct. 2266; cf. Altman v. Bedford Cent. Sch. Dist., 245 F.3d at 80 (rejecting constitutional challenge to Earth Day program in which students were not required to participate). That concern, however, is not present in this case.
 
 
 [28]
 Our dissenting colleague concludes that a parent observer, "charged with such knowledge," nevertheless, "would not unreasonably perceive the State's endorsement of Judaism and Islam and disapproval of Christianity" in the challenged holiday display policyPost at [58 n. 4]. We cannot agree. No reasonable objective observer — who accepted the Supreme Court's menorah decision in Allegheny, who respected pluralism, who recognized that the public had (after Allegheny) increasingly come to accept the display of a menorah together with a Christmas tree as a symbol of tolerance and freedom associated with the holiday season, and who understood the continued controversy about the crèche's ability to communicate that same secular message — would think that the purpose or effect of the defendants' challenged policy was to signal to schoolchildren official endorsement of Judaism and Islam or disapproval of Christianity.
 
 
 [29]
 By characterizing the menorah as a secular symbol, the DOE cannot, of course, ignore its responsibility to ensure that the menorah is not used in public schools in a religious ritual or displayed in a way that conveys a religious message. Nothing in the record, however, indicates that either concern arises in this case
 
 
 
 167
 STRAUB, Circuit Judge, concurring in part and dissenting in part.
 
 
 168
 Today, the majority approves a policy directed at the participation of public school children in a year-end holiday celebration that utilizes religious symbols of certain religions, but bans the religious symbol of another. As I do not understand the law to countenance such in respect of the most impressionable of our society, I respectfully dissent from the majority's decision on the Establishment Clause claim asserted by Plaintiff Andrea Skoros ("Skoros"). I concur, however, in the majority's affirmance of the District Court's rejection of Skoros's Free Exercise and parental rights claims.
 
 I. Establishment Clause Claim
 
 169
 It is my view that the policy of the New York City Department of Education ("DOE") to arrange for the children to celebrate the holiday season in schools through the use of displays and activities that include religious symbols of the Jewish holiday of Chanukah and the Muslim commemoration of Ramadan, but starkly exclude any religious symbols of the Christian holiday of Christmas, fails under the endorsement prong of the Lemon test, both on its face and as applied. My chief disagreement with the majority is as to the "reasonable observer" in this case. It is my view that we must view the displays and celebrations from the perspective of elementary or secondary school students in the New York City public school system, as well as from the perspective of parents of such students who experience the displays through and with their children and who have knowledge of the history and context of the policy and displays. In failing to examine the displays and celebrations from the perspective of the students, the majority pays only lip service, and indeed, effectively turns a blind eye, to the significant impact of the students' impressionability and youth.
 
 
 170
 Keeping those two relevant factors in mind, and erring on the side of protecting such children in the face of less-than-clear Supreme Court precedent, I would hold that the policy and displays send the message of endorsement of Judaism and Islam to a reasonable student observer. I would also hold that the displays convey to a reasonable parent observer that Judaism and Islam are favored and that Christianity is disfavored. Furthermore, I would also hold that the DOE's policy risks excessive entanglement inasmuch as it adopts an official State position on a point of religious doctrine by defining a menorah and star and crescent as secular symbols, and a "crèche" as "purely religious."
 
 A. Background
 
 171
 The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion ...." U.S. Const. amend I. This prohibition applies to the states through the Fourteenth Amendment. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). As the majority notes, the Supreme Court precedent dealing with the Establishment Clause is marked by "frequently splintered Supreme Court decisions," ante at [13], and the Court's members "have rarely agreed — in either analysis or outcome — in distinguishing the permissible from the impermissible public display of symbols having some religious significance," ante at [13]. Two recent decisions of the Supreme Court, Van Orden v. Perry, ___ U.S. ___, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005), and McCreary County v. ACLU of Kentucky, ___ U.S. ___, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005), examining the constitutionality of two public displays of the Ten Commandments, constitute the Court's latest pronouncements on the Establishment Clause.
 
 
 172
 In Van Orden, the plurality explicitly declined to disavow completely the "test" set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105 (1971), which provides that a court examining whether a governmental practice violates the Establishment Clause must consider: (1) whether the challenged practice has a secular purpose, (2) whether the practice either advances or inhibits religion in its principal or primary effect, and (3) whether the practice fosters excessive government "entanglement" with religion. That said, the plurality in Van Orden held that the Lemon test was "not useful in dealing with the sort of passive monument" as the Ten Commandments display at issue there. 125 S.Ct. at 2861. According to the plurality, the analysis in such a case should be driven "both by the nature of the monument and by our Nation's history." Id. Examining the Texas display in such context, including, e.g., the role played by the Ten Commandments in our Nation's history, the plurality concluded that the State of Texas did not violate the Establishment Clause by its display of the Ten Commandments monument on the grounds of its capitol. Id. at 2864.
 
 
 173
 The plurality emphasized, however, that the public classroom presents a different context. The plurality distinguished the "passive use" of the Ten Commandments text by the State of Texas from the impermissible use of the text by the State of Kentucky in Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), where displays of the Ten Commandments in public schools "confronted elementary school students every day." Id. at 2864.
 
 
 174
 Justice Breyer, in a concurring opinion that created a majority as to the result, emphasized that "no single mechanical formula... can accurately draw the constitutional line in every case," id. at 2868 (Breyer, J., concurring in the judgment), and that "[w]hile the Court's prior tests provide useful guideposts... no exact formula can dictate a resolution to such fact-intensive cases," id. at 2869 (internal citation omitted). Justice Breyer noted that the text of the Ten Commandments "undeniably has a religious message," but cautioned that "focusing on the text of the Commandments alone cannot conclusively resolve th[e] case." Id. Rather, Justice Breyer stated, the display ought be examined for "how the text [of the Ten Commandments] is used," which inquiry requires us to "consider the context of the display." Id. Justice Breyer concluded that the "circumstances surrounding the display's placement on the capitol grounds and its physical setting suggest that the State" intended the monument's non-religious message "to predominate." Id. at 2870. Justice Breyer also found it significant that "40 years [had] passed in which the presence of this monument, legally speaking, went unchallenged." Id. According to Justice Breyer, "those 40 years suggest more strongly than can any set of formulaic tests that few individuals, whatever their system of beliefs, are likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort" to favor, engage in, compel, or deter, religion. Id. Justice Breyer also emphasized that the display in Van Orden presented a much different context than one "on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state." Id. at 2871.
 
 
 175
 In McCreary County v. ACLU of Kentucky, ___ U.S. ___, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005), Justice Souter, writing for the majority, also explicitly declined the petitioners' request to abandon the Lemon test, id. at 2734-35, and instead applied Lemon in that case and found that the Ten Commandments display at issue violated the Establishment Clause insofar as it failed the first prong of the Lemon test, i.e., the display was created with a religious purpose. The Court held that "the development of the presentation" should be considered in determining the purpose of a display, id. at 2728, and noted that the county's initial decision to install the Ten Commandments display, and later decision to amend the display, were undertaken with the impermissible intent to advance religion. Id. at 2738-40. The Court also found that the stated secular purpose of the final iteration of the display was presented merely as "a litigating position" and did not "repeal[] or otherwise repudiate[]" the initial purposes. Id. at 2740.
 
 
 176
 In light of the foregoing, I find it appropriate in the instant case to apply the Lemon test, with some concern for the display's "context." The Supreme Court's recent opinions indicate that an examination of the purpose of a display, see McCreary County, 125 S.Ct. at 2732, and its particular context, see Van Orden, 125 S.Ct. at 2869-70 (Breyer, J., concurring in the judgment), are relevant considerations under the Establishment Clause, and that the Lemon test is still viable, see McCreary County, 125 S.Ct. at 2734-35, although there is "no test-related substitute for the exercise of legal judgment," Van Orden, 125 S.Ct. at 2869 (Breyer, J., concurring in the judgment).
 
 
 177
 As the majority notes, under Lemon, a court examining whether a governmental practice violates the Establishment Clause must consider: (1) whether the challenged practice has a secular purpose, (2) whether the practice either advances or inhibits religion in its principal or primary effect, and (3) whether the practice fosters excessive government "entanglement" with religion. See Elewski v. City of Syracuse, 123 F.3d 51, 55 (2d Cir.1997). The second prong is an "endorsement" test, which asks whether "a reasonable observer of the display in its particular context [would] perceive a message of governmental endorsement or sponsorship of religion." See id. at 53; see also County of Allegheny v. ACLU, 492 U.S. 573, 593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (the Establishment Clause "`preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred'" (quoting Wallace v. Jaffree, 472 U.S. 38, 70, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in the judgment))); Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (the Establishment Clause prohibits "making adherence to a religion relevant in any way to a person's standing in the political community").
 
 
 178
 The endorsement test "`necessarily focuses upon the perception of a reasonable, informed observer [who] must be deemed aware of the history and context of the community and forum in which the religious display appears.'" Elewski, 123 F.3d at 54 (alteration in original) (quoting Creatore v. Town of Trumbull, 68 F.3d 59, 61 (2d Cir.1995) (internal quotation marks omitted)). The endorsement test "requires careful and often difficult linedrawing and is highly context specific." Allegheny, 492 U.S. at 631, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment); see also id. at 597, 109 S.Ct. 3086 ("[T]he effect of the government's use of religious symbolism depends upon its context.... [O]ur present task is to determine whether the display of the crèche and the menorah, in their respective `particular physical settings,' has the effect of endorsing or disapproving religious beliefs."). As the Supreme Court stated in Lynch, "[i]n each case, the inquiry calls for line-drawing; no fixed, per se rule can be framed." 465 U.S. at 678, 104 S.Ct. 1355. We noted in Altman v. Bedford Central School District, 245 F.3d 49 (2d Cir.2001), that, in analyzing an Establishment Clause claim in the public school context, we must also consider whether the government is "`coerc[ing] anyone to support or participate in religion or its exercise.'" Id. at 75 (quoting Santa Fe, 530 U.S. at 302, 120 S.Ct. 2266 (quoting Lee v. Weisman, 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992))).
 
 
 179
 As noted in the plurality opinion in Van Orden and in Justice Breyer's concurrence, the "context" of a display matters significantly. Indeed, in Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), the Court counseled that we must be particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the students and his or her family. Students are impressionable and their attendance is involuntary.... [T]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the state is it more vital to keep out divisive forces than in its schools.
 
 
 180
 Id. at 583-84, 107 S.Ct. 2573 (internal citations and quotation marks omitted).
 
 B. Analysis
 
 181
 Employing the Lemon analysis and keeping in mind the Court's directive in Edwards, I find that the DOE's policy and the attendant displays and celebrations violate the Establishment Clause. This conclusion is informed by the fact that the Supreme Court precedent dealing with the Establishment Clause is marked by, as the majority concedes, "frequently splintered Supreme Court decisions," ante at [13], and a less-than-clear statement of the law that results in courts analyzing such displays using what one Justice characterized as "little more than intuition and a tape measure," Allegheny, 492 U.S. at 675, 109 S.Ct. 3086 (Kennedy, J., concurring in the judgment in part and dissenting in part). Indeed, the fine line-drawing and potential for error in an Establishment Clause analysis requires that we err on the side of protecting New York City schoolchildren from any suggestion that the State disapproves of their religion.
 
 
 182
 I begin my analysis with the first factor in the Lemon inquiry, purpose.
 
 1. Purpose
 
 183
 I agree with the majority that the DOE's asserted purpose in effectuating the Holiday Display Memorandum, i.e., to celebrate the secular holiday season, is a secular one, see Lynch, 465 U.S. at 681, 104 S.Ct. 1355 (finding intent to celebrate the secular holiday season to be a "legitimate secular purpose[]").[1] I also agree that this claimed purpose is not a sham. Thus, to the extent that the first prong of the Lemon test inquires into the State's "actual purpose" and its "subjective" intent to communicate a particular message, id. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring), I would agree that the defendants do not run afoul of the first prong.
 
 
 184
 On the other hand, as noted by the majority, the Supreme Court's recent decision in McCreary may suggest a shift in the inquiry, insofar as it states that purpose should be determined by an "objective observer." See McCreary, 125 S.Ct. at 2734-35. If, following McCreary, the question focuses more on the government's intent as perceived by an "objective" or "reasonable" observer in the community, my conclusion as to purpose would be different. As explained below with respect to the second Lemon factor, I would find that, however the "objective observer" is defined, the observer would perceive the school's intent as conveying a message about religion and as a celebration of religious holidays, rather than as a celebration of the secular holiday season. Ultimately, however, I believe these concerns are better addressed under the second prong of the Lemon test, which inquires into the effect of the display on its observers and "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." Lynch, 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring).
 
 2. Endorsement and the Effects Inquiry
 
 185
 As explained above, the second inquiry of the Lemon test is designed to prevent government practices that "have the effect of communicating a message of government endorsement or disapproval of religion," and that have the effect, "whether intentionally or unintentionally, [of] mak[ing] religion relevant, in reality or public perception, to status in the political community." Id. at 692, 104 S.Ct. 1355. With respect to the effects inquiry, I depart from the majority on two points: (a) how to identify the relevant reasonable observers; and (b) whether the message conveyed is fairly understood as an endorsement or disapproval of certain religions.
 
 
 186
 a. The Reasonable Observer
 
 
 187
 As the majority notes, the Supreme Court in Allegheny adopted the endorsement test proposed by Justice O'Connor in Lynch, making the relevant question for the second prong of Lemon inquiry whether a particular display, in context, "has the effect of endorsing or disapproving religious beliefs." County of Allegheny v. ACLU, 492 U.S. 573, 597, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In her concurrence in Allegheny, Justice O'Connor further described the endorsement test in terms of "a reasonable observer [who] evaluates whether a governmental practice conveys a message of endorsement of religion." Id. at 630, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment). Following Allegheny, Justice O'Connor recognized a "fundamental point of departure" concerning "the test's reasonable observer" who evaluates the message conveyed. Capitol Square Review & Adv. Bd. v. Pinette, 515 U.S. 753, 778, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (internal quotation marks omitted). The endorsement test, Justice O'Connor explained, should not "focus on the actual perception of individual observers, who naturally have differing degrees of knowledge." Id. at 779, 115 S.Ct. 2440. Instead, "the endorsement test creates a more collective standard to gauge `the "objective" meaning of the [government's] statement in the community.'" Id. (alteration in original) (quoting Lynch, 465 U.S. at 690, 104 S.Ct. 1355). The applicable observer is "a personification of a community ideal of reasonable behavior determined by the collective social judgment." Id. at 780, 104 S.Ct. 1355 (alteration and internal quotation marks omitted). In that regard, Justice O'Connor explained that "the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears." Id.
 
 
 188
 The focus of Justice O'Connor's reasoning, however, was on avoiding the possibility that a practice may be struck down "simply because a particular viewer of a display might feel uncomfortable." Id. The endorsement test remains grounded in the "essential command of the Establishment Clause": preventing government from "mak[ing] a person's religious beliefs relevant to his or her standing in the community," and from "sending a clear message" to individuals that "they are outsiders or less than full members of the political community." Allegheny, 492 U.S. at 627, 109 S.Ct. 3086 (O'Connor, J., concurring in part and concurring in the judgment). To this extent, the perspective of a "reasonable observer" must depend upon "`the community and forum in which the religious display appears.'" Elewski, 123 F.3d at 54 (quoting Creatore, 68 F.3d at 61 (internal quotation marks omitted)). That is, although we will imbue the observer with certain degrees of reasonableness and levels of knowledge, we must not lose focus on who is actually the recipient of the message conveyed and how that message will affect such a recipient.
 
 
 189
 Thus, in Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), as the majority concedes, the Supreme Court viewed the alleged Establishment Clause violation from the perspective of an objective high school student. See id. at 307, 120 S.Ct. 2266 ("[T]he expressed purposes of the policy encourage the selection of a religious message, and that is precisely how the students understand the policy." (emphasis added)); id. at 308, 120 S.Ct. 2266 ("[A]n objective Santa Fe High School student will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval." (emphasis added)). There, the court found unconstitutional under the Establishment Clause a pre-football game prayer led by a high school student who was elected student council chaplain insofar as the activity had a religious purpose and "the members of the listening audience must perceive the pre-game message as a public expression of the views of the majority of the student body delivered with the approval of the school administration." Id. at 308, 120 S.Ct. 2266. The Court also cast schoolchildren as the reasonable observers in Board of Education of Westside Community Schools (District 66) v. Mergens, 496 U.S. 226, 249-52, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (examining whether "an objective observer in the position of a secondary school student will perceive official school support for ... [on-campus] religious meetings"), and other courts have done so as well, see, e.g., Kitzmiller v. Dover Area School Dist., 400 F.Supp.2d 707, 715, 722-23 (M.D.Pa. 2005) (viewing curriculum of intelligent design from the perspective of schoolchildren for purposes of determining Establishment Clause violation); Verbena United Methodist Church v. Chilton County Bd. of Educ., 765 F.Supp. 704, 711 (M.D.Ala.1991) ("In cases involving schoolchildren, the operative inquiry is whether an `objective observer' in the position of a student of the relevant age would `perceive official school support' for the religious activity in question." (quoting Mergens, 496 U.S. at 249, 110 S.Ct. 2356)). The perspective of a student is relevant in both an endorsement inquiry and in an examination of a practice's coercive potential. Compare Santa Fe, 530 U.S. at 307-10, 120 S.Ct. 2266 (examining whether students would perceive school endorsement of religious prayer at football game), and Mergens, 496 U.S. at 249-52, 110 S.Ct. 2356 (examining whether students would perceive school endorsement of religion by meetings of religious student groups on school grounds), with Santa Fe, 530 U.S. at 310, 120 S.Ct. 2266 (examining whether dissenting students would feel coercion to participate in religious observances), and Lee, 505 U.S. at 593, 112 S.Ct. 2649 (considering the perspective of "the dissenter of high school age" in determining whether graduation ceremony coerced religious exercise).
 
 
 190
 In this case, the primary audience is the schoolchildren "for whose benefit these displays are created" and who "have no option but to view them and, sometimes, participate in the craft projects integral to many of the displays." Ante at [____]. Given that they are the most direct observers of the displays and participants in the celebrations, I believe that we must inquire into the effect of the policy and displays on reasonable elementary and secondary schoolchildren.[2]
 
 
 191
 The majority, in contrast, frames the reasonable observer as "an adult who is aware of the history and context of the community and forum in which the religious display appears, and who understands that the display of a religious symbol in a school context may raise particular endorsement concerns, because of the pressure exerted on children by the law of imitation." Ante at [30-31] (internal citations and quotation marks omitted). The majority takes this approach largely because, it says, "it makes no sense at the effect step to view a kindergarten child or first grader as someone `fully cognizant of the history, ubiquity, and context of the practice in question,'" id. at [30] (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 34-35, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring in the judgment)), and because "of the range of the students to whom the challenged display policy applies," ante at [30]. The majority cites Good News Club v. Milford Central School, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), as analogous, but that case merely holds that we must view "coercive pressure" to engage in after-school activities from the perspective of the parents of elementary school students, rather than from the students' perspective, where those activities required parental consent for participation. See id. at 115, 121 S.Ct. 2093 ("It is the parents who choose whether their children will attend the Good News Club meetings. Because the children cannot attend without their parents' permission, they cannot be coerced into engaging in Good News Club's religious activities."). Here, in contrast, the displays are exhibited during school hours and may be viewed without parental consent, as with the celebrations.
 
 
 192
 Furthermore, the majority determines the reasonable observer in a backwards fashion. I understand Justice O'Connor's "reasonable observer" inquiry as imputing certain levels of knowledge and reasonableness where appropriate for the intended audience. The majority, however, defines the applicable observer not according to the primary audience, but according to who would have the typical levels of knowledge.
 
 
 193
 While I acknowledge that it is difficult to impute awareness of history and culture to children, I cannot see how or why we should conduct an effects test that does not examine the effects on the most direct observers. Moreover, the effects inquiry must take into account the context of the displays. See Allegheny, 492 U.S. at 597, 109 S.Ct. 3086; Elewski, 123 F.3d at 54. In this case, a crucial aspect of the context is that the displays are in elementary schools and are directed at children who lack a broader knowledge of history and culture. See Lee v. Weisman, 505 U.S. 577, 597, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (explaining that "[o]ur Establishment Clause jurisprudence remains a delicate and fact-sensitive one," and that prior precedent "requires us to distinguish the public school context"). Indeed, it is particularly because of a child's lack of broader knowledge — and thus the lack of a broader ability to contextualize and analyze a display — that children are uniquely vulnerable to government messages of endorsement or disapproval. See id. at 592, 112 S.Ct. 2649 ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."); Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (explaining that the effects inquiry "must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years ... [because their] experience is limited and [their] beliefs consequently are the function of environment as much as of free and voluntary choice"), overruled on other grounds, Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); Brandon v. Board of Ed. of Guilderland Cent. Sch. Dist., 635 F.2d 971, 978 (2d Cir.1980) ("To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed. This symbolic inference is too dangerous to permit.... Misconceptions over the appropriate roles of church and state learned during one's school years may never be corrected." (citations omitted)); Selman v. Cobb County School Dist., 390 F.Supp.2d 1286, 1311 (N.D.Ga.2005) (holding that sticker on textbook providing that evolution was theory was likely to convey a message of endorsement "given the Sticker's intended audience, impressionable school students"); Joki v. Bd. of Educ., 745 F.Supp. 823, 831 (N.D.N.Y.1990) (emphasizing impressionability of children in holding that display of painting with religious theme in high school auditorium had effect of conveying message of endorsement of religion). Indeed, Justice Blackmun stated that the outcome in Allegheny might have been different had it involved a public school, and he refused to hold that "the combined display of a Christmas tree and a menorah is constitutional wherever it may be located on government property. For example, when located in a public school, such a display might raise additional constitutional considerations." Allegheny, 492 U.S. at 620 n. 69, 109 S.Ct. 3086. It is precisely those additional constitutional considerations that concern me in this case. Indeed, as the majority at bottom concedes, the impressionability of the child is paramount here.
 
 
 194
 In light of the foregoing, I believe that we must view the displays and celebrations from the perspective of the students in the relevant elementary and secondary public schools. And, as will be explained below, I believe that a reasonable schoolchild would view the displays and celebrations as conveying endorsement of the religious holidays depicted — Chanukah and Ramadan — rather than a general celebration of a secular holiday season.
 
 
 195
 I also believe, however, that schoolchildren are not the only relevant observers in this case. The displays' messages are also conveyed to the children's parents both directly (upon, for example, a parent's visit to the school), and indirectly, as parents hear about the holiday programs and celebrations through their children and assist them in creating presentations for display at school. As with the children, the parents make up the "community" of the school, and thus I believe we should also inquire into the effect on a reasonable parent. This "reasonable parent observer" is not the same hypothetical non-student "adult" observer identified by the majority. The majority's hypothetical non-student "adult" observer is not an "observer" at all, or rather, is an observer once removed. That is, the observer speculates as to how a child would observe the display and then purports to give its own "observation" of what it thinks a child would "observe." A court must, however, consider the display in its particular "context" and "community"; it must take care not to impose its own perspective on the hypothetical reasonable person. Here, therefore, a parent of a student is the relevant adult observer. The reasonable parent observer is certainly more informed of the history and cultural context underlying the policy and displays than the reasonable student observer. For reasons explained fully below, it is my view that a reasonable parent observer, viewing the displays as depicting religious iconography of Judaism and Islam but as conspicuously excluding the religious — as opposed to purely secular — symbols of Christmas, would perceive the displays as sending the message that Judaism and Islam are favored and that Christianity is disfavored.
 
 
 196
 b. Analyzing the Effect
 
 
 197
 The DOE's policy purports to allow public schools to celebrate the secular holiday season and commemorate that season with certain decor. The policy by its terms limits that decor to what it defines as "secular" symbols, including without limitation a Christmas tree, a menorah, and a star and crescent. The DOE also concedes that it interprets the policy to prohibit the display of a nativity scene or crèche and characterizes such a symbol as "purely religious." Appellees' Brief at 9; Joint Stip. of Facts at ¶ 13.
 
 
 198
 It cannot be gainsaid that the menorah and star and crescent are religious symbols. See, e.g., Allegheny, 492 U.S. at 613, 109 S.Ct. 3086 ("The menorah, one must recognize, is a religious symbol: it serves to commemorate the miracle of the oil as described in the Talmud. But the menorah's message is not exclusively religious."); Kaplan v. City of Burlington, 891 F.2d 1024, 1026 (2d Cir.1989) ("A menorah is a religious symbol of the Jewish faith, and is recognized as such by the general public."); The Oxford Dictionary of World Religions 246 (John Bowker ed., Oxford University Press 1997) (identifying the crescent moon as a "[r]eligious emblem of Islam, derived from the Quranic recognition of the waxing and waning of the moon as a sign of God's unchanging purpose and control" and noting that the "crescent on the cupola of a mosque indicates the direction of Mecca"); Annemarie Schimmel, Islamic Iconography, in 7 The Encyclopedia of Religion 64, 66 (Mircea Eliade ed., MacMillan Publishing Co.1987) (stating that the crescent "has come to be regarded as the typical sign of Islam" and "now is generally seen as the Islamic equivalent of the Christian cross," "although its first appearance on early Islamic coins, metalwork, and ceramics had no religious connotations"). The majority concedes as much, ante at [20 & n. 16], and indeed, concludes that a menorah and star and crescent are as religious in nature as a crèche, ante at [27-28]. Moreover, though neither a menorah nor a star and crescent depict a deity, both relate directly to a deity — God performed the miracle exemplified by the menorah, and the crescent depicts the waxing and waning of the moon as a sign of God's purpose and control over the universe.
 
 
 199
 A Christmas tree, however, is a purely secular symbol. See, e.g., County of Allegheny v. ACLU, 492 U.S. 573, 616, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("The Christmas tree, unlike the menorah, is not itself a religious symbol."); Laurence H. Tribe, American Constitutional Law § 14-15, at 1295 (2d ed.1988) (noting that history has "neutralized" the Christmas tree, which was "once associated with the Tree of Life in the Garden of Eden" (citing American Civil Liberties Union v. St. Charles, 794 F.2d 265, 271 (7th Cir.1986)) (citing Thomas G. Crippen, Christmas and Christmas Lore 153 (1923), and II Encyclopaedia Britanncia: Micropaedia 904 (15th ed.1975))). Furthermore, though the District Court and majority attempt to characterize some of the stars depicted in the displays as "Stars of Bethlehem," ante at [28 n. 24], there is nothing in the displays that suggests such a conclusion. The other "Christmas" symbols the DOE allows to be displayed as part of the secular holiday celebration are purely secular. As Judge Posner noted in American Civil Liberties Union v. St. Charles,
 
 
 200
 [t]here is nothing distinctively Christian about reindeer, Santa Claus, gift-giving, eggnog, tinsel, toys, retail sales, roast goose, or the music (as distinct from the words) of Christmas carols. Some symbols that are Christian — such as the holly wreath, which both symbolizes Christ's hegemony (wreaths and garlands being a traditional symbol of kingship and prowess) and recalls the crown of thorns that was placed on His head before He was crucified, to mock His supposed Kingship — have lost their Christian connotations. They are regarded by most people, including most Christians, as purely decorative.... The five-pointed star of Bethlehem, while unmistakably a part of the story of the birth of Jesus Christ, is the same star used in the American flag, and in many other secular settings; it, too, has lost its religious connotations for most people.
 
 
 201
 794 F.2d at 271 (internal citations omitted). Finally, contrary to the District Court's finding, a crèche, or nativity scene, depicts a historical event and thus, has some non-religious aspect to it.
 
 
 202
 A parent who fully understands "the history, ubiquity, and context" of the policy and displays, Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 40, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring in the judgment), and who experiences the displays either in person or through working with his or her child at home, would not unreasonably perceive a difference in the manner in which the different religions are treated by the schools. The parent would certainly understand that the menorah and star and crescent are symbols of great significance in the Jewish and Muslim religions. They would also understand that Christmas is represented by objects that are purely secular, if not, pagan (Christmas trees, snowmen, snowflakes, wreaths, stockings, Santa Claus figures, gingerbread men, and wrapped gifts). The parent would note that Jewish and Muslim students are allowed to create and observe symbols that are consistent with those they have viewed from a young age in their religious celebrations at home and in their places of worship, while Christian students are not. The reasonable parent observer would also be aware of Ms. Skoros's request to add a crèche to the list of approved symbols, and the DOE's rejection, as well as the public correspondence between the two. In light of the foregoing, it is my view that the reasonable parent observer would understand the inclusion of religious symbols of the Jewish holiday of Chanukah and the Muslim commemoration of Ramadan, and exclusion of any religious symbols of the Christian holiday of Christmas, to convey the State's approval of Judaism and Islam and disapproval of Christianity. The touchstone of the Establishment Clause, its principle of neutrality, forbids such favoritism. See McCreary County v. ACLU of Kentucky, ___ U.S. ___, ___, 125 S.Ct. 2722, 2742, 162 L.Ed.2d 729 (2005) ("[T]he government may not favor one religion over another."); Board of Ed. of Kiryas Joel Vill. Sch. Dis. v. Grumet, 512 U.S. 687, 706, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (invalidating a state law that created a separate school district to serve a community of highly religious Jews exclusively because it "single[d] out a particular religious sect for special treatment"). As then-Chief Justice Bird of the California Supreme Court noted in Fox v. City of Los Angeles, 22 Cal.3d 792, 587 P.2d 663, 150 Cal.Rptr. 867 (1978):
 
 
 203
 When a city so openly promotes the religious meaning of one religion's holidays, the benefit reaped by that religion and the disadvantage suffered by other religions is obvious. Those persons who do not share those holidays are relegated to the status of outsiders by their own government; those persons who do observe those holidays can take pleasure in seeing the symbol of their belief given official sanction and special status.
 
 
 204
 22 Cal.3d at 803, 587 P.2d at 670, 150 Cal.Rptr. at 874 (Bird, C.J., concurring).
 
 
 205
 It is also my view that a reasonable student observer would view the displays and celebrations as conveying the endorsement of Judaism and Islam. A Jewish or Muslim student viewing the displays or completing assignments in connection with the displays would understand the religious nature of the menorahs and stars and crescents and would understand that the symbols represent Chanukah and Ramadan. Jewish and Muslim students would find the symbols consistent with those they view in their religious celebrations at home and in their places of worship. A young student, therefore, would likely be confused as to whether the activity is meant to celebrate the secular "winter holiday season" or whether it is meant to celebrate Chanukah and Ramadan as religious holidays. We must remind ourselves that we are dealing with "impressionable children" who are likely to "perceive, however wrongly," the imprimatur of state approval of religion. Tribe, supra § 14-6, at 1178-79. There is a fine line between the celebration of the secular "winter holiday season" and the celebration of the three religious events of Christmas, Chanukah, and Ramadan; it is a distinction with which a young child will likely have more difficulty than an adult. The majority concedes that the religious significance of religious symbols may be more obvious to schoolchildren, ante at [28]. Because of the content of the displays, the children would fairly understand the purpose of the displays (and their own acts in creating the displays) to be the celebration of Chanukah and Ramadan as religious holidays. See Allegheny, 492 U.S. at 595, 109 S.Ct. 3086 ("[T]he question is `what viewers may fairly understand to be the purpose of the display.'" (quoting Lynch, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring))); see also Stone v. Graham, 449 U.S. 39, 42, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (holding that "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments"). Such is inconsistent with the Establishment Clause. See Allegheny, 492 U.S. at 614-15, 109 S.Ct. 3086 ("If the city celebrates both Christmas and Chanukah as religious holidays, then it violates the Establishment Clause. The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone.").
 
 
 206
 Because of the young age of the children and the particular objects allowed in the displays here, the display's setting does not "negate[] any message of endorsement" of the Jewish beliefs represented by the menorah or the Muslim beliefs represented by the star and crescent. Lynch, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring). There is a great risk that a young student will perceive the government as endorsing the religious message of the religious symbols chosen for presentation. This case is thus unlike the cases cited by the majority involving holiday displays on public property, because the mere fact that the displays here contains symbols associated with different religions and some non-religious symbols will not necessarily dilute or change the focus from a religious message to something else. See Elewski v. City of Syracuse, 123 F.3d 51, 54 (2d Cir.1997) ("[I]f [a symbol]'s context ... neutralizes the message of governmental endorsement, then the [symbol] passes muster under the Establishment Clause."). The secular message of pluralism — what saved the holiday displays in Lynch and Allegheny — will not necessarily come across in the participatory public school context.
 
 
 207
 The majority takes issue with the dissent's "cast[ing] school children of ... varying ... religious backgrounds" as the reasonable observers in this case. Ante at [24]. Any Establishment Clause inquiry in public schools must, however, determine whether "school sponsorship of a religious message... sends the ancillary message to members of the audience who are nonadherents `that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 309-10, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quoting Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring)). In order to examine whether a display sends such message, we must consider the perspective of adherents and nonadherents alike. See Kaplan v. City of Burlington, 891 F.2d 1024, 1030-31 (2d Cir.1989) (considering the views of "members of minority religions or nonbelievers" as well as "members of the majority faith" in Establishment Clause inquiry); Selman v. Cobb County School Dist., 390 F.Supp.2d 1286, 1306 (N.D.Ga.2005) (concluding that sticker concerning evolution "sends a message to those who oppose evolution for religious reasons that they are favored members of the political community ... [and] sends a message to those who believe in evolution that they are political outsiders"); see also Capitol Square Review & Adv. Bd. v. Pinette, 515 U.S. 753, 799, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (Stevens, J., dissenting) ("It is especially important to take account of the perspective of a reasonable observer who may not share the particular religious belief [the display] expresses."); Benjamin I. Sachs, Case Note, Whose Reasonableness Counts?, 107 YALE L.J. 1523, 1526 (1998). Indeed, in Santa Fe, the Supreme Court considered the possible impressions of the students who supported the religious message, as well as those "dissenter" or "nonbeliever" students. See Santa Fe, 530 U.S. at 305, 120 S.Ct. 2266 ("[W]hile Santa Fe's majoritarian election might ensure that most of the students are represented, it does nothing to protect the minority; indeed, it likely serves to intensify their offense."); see id. ("Contrary to the District's repeated assertions that it has adopted a `hands-off' approach to the pregame invocation, the realities of the situation plainly reveal that its policy involves both perceived and actual endorsement of religion.... [T]he degree of school involvement makes it clear that the pregame prayers bear the imprint of the State and thus put school-age children who objected in an untenable position." (internal quotation marks omitted)). In Lee v. Weisman, in the context of coercion, the Supreme Court considered the effect of the religious graduation speech from the perspective of adherents as well as of the "dissenter of high school age." 505 U.S. 577, 593, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) ("[F]or the dissenter of high school age, who has a reasonable perception that she is being forced by the State to pray in a manner her conscience will not allow, the injury is no less real.... [A] reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it."); id. at 597, 112 S.Ct. 2649 ("[W]e do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. But .... the State has in every practical sense compelled attendance and participation in an explicit religious exercise at an event of singular importance to every student, one the objecting student had no real alternative to avoid."); see also Santa Fe, 530 U.S. at 312, 120 S.Ct. 2266 ("[W]hat to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy." (quoting Lee, 505 U.S. at 592, 112 S.Ct. 2649)). The majority's objective observer — of adult age and no religious affiliation — is of no use in this context; our Establishment Clause inquiry should not be concerned with a display's effect on an individual, like a judge, who is outside the community in question and who merely "tak[es] into consideration" the effect on schoolchildren of differing religions, but, rather, we must focus upon the actual context and community in which the displays are located. See, e.g., Santa Fe, 530 U.S. at 308, 120 S.Ct. 2266 (stating that we must consider how "the members of the listening audience" perceived the religious message). For all the foregoing reasons, I find it most appropriate to view the displays in their actual context and in consideration of the actual community that receives the message.[3]
 
 
 208
 As noted above, and in Laurence H. Tribe, American Constitutional Law § 14-6, at 1178 n. 53 (2d ed.1988), age has been given great weight in the Supreme Court cases involving schools. See, e.g., Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 385, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (stating that use of public funds for teaching of state-required subjects at private religious schools "may provide a crucial symbolic link between government and religion, thereby enlisting-at least in the eyes of impressionable youngsters-the powers of government to the support of the religious denomination operating the school") (emphasis added), overruled on other grounds, Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The Court has noted that "[t]he symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice." Id. at 390, 105 S.Ct. 3216; Widmar v. Vincent, 454 U.S. 263, 274 n. 14, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("University students are, of course, young adults. They are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion.").
 
 
 209
 Furthermore, it is quite relevant here that, unlike in the public display cases, the students participate in creating the displays and in celebrating the holiday season under mandatory circumstances. As the Supreme Court stated in Lee, the compulsory nature of attendance "require[s] us to distinguish the public school context." 505 U.S. at 597, 112 S.Ct. 2649; see also id. (contrasting the school prayer with the legislative prayer in Marsh and holding that "[t]he atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend. The influence and force of a formal exercise in a school graduation are far greater than the prayer exercise we condoned in Marsh"); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (finding significant that religious activity was "prescribed as part of the curricular activities of students who are required by law to attend school" and "held in the school buildings under the supervision and with the participation of teachers employed in those schools"); Schempp, 374 U.S. at 252-53, 83 S.Ct. 1560 (Brennan, J., concurring) (asserting that the distinction between "the voluntary attendance at college of young adults" and "the compelled attendance of young children at elementary secondary schools .... warrants a difference in constitutional results").
 
 
 210
 Requiring religious exercise in schools has long been found unconstitutional under the Establishment Clause. Never has the Supreme Court held, as the majority does here, that the non-educational use of religious symbols in public schools is constitutionally acceptable. In Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Court addressed a mandate from the New York State Board of Regents directing public school students to read aloud the following daily prayer: "`Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country.'" Id. at 422, 82 S.Ct. 1261. According to the Court, neither the fact that the prayer was "denominationally neutral," nor the fact that "its observance on the part of the students [was] voluntary," saved the prayer from violating the Establishment Clause's prohibition on the use of the power and support of the government to control or influence religious beliefs. Id. at 430, 82 S.Ct. 1261.
 
 
 211
 One year later, in School District of Abington Township v. Schempp, the Supreme Court found unconstitutional under the Establishment Clause a state statute "requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison." 374 U.S. at 223, 83 S.Ct. 1560. The Court held that, contrary to the State's assertions, the Bible was not being used "as an instrument for nonreligious moral inspiration or as a reference for the teaching of secular subjects," id. at 224, 83 S.Ct. 1560, but rather, the exercises were a religious ceremony.
 
 
 212
 In Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), the Supreme Court held that the display of the Ten Commandments on the walls of public classrooms violated the Establishment Clause. The Court found that the Kentucky statute governing such had no secular purpose, despite the State's claim to the contrary, and that "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the school children to read, meditate upon, perhaps to venerate and obey, the Commandments." Id. at 42, 101 S.Ct. 192; see also Wallace v. Jaffree, 472 U.S. 38, 59-60, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (holding that Alabama statute requiring one-minute moment of silence for "meditation or voluntary prayer," violated the Establishment Clause insofar as it had no secular purpose).
 
 
 213
 In Lee, as noted above, the Court held that a commencement prayer given by a rabbi at a secondary school commencement would violate the Establishment Clause. See id. at 598-99, 112 S.Ct. 2649. The Court noted the special danger of religious exercise sanctioned or monitored by school officials, remarking that a school official's "effort to monitor prayer will be perceived by the students as inducing a participation they might otherwise reject." Id. at 590, 112 S.Ct. 2649. The Court in Lee found "subtle coercive pressures" insofar as there was no "real alternative" for a student who wished to avoid participating or the "appearance of participation" in the commencement prayer. 505 U.S. at 588, 112 S.Ct. 2649. That the school attempted to make the prayer nondenominational did not save its unconstitutionality. See id. at 588-89, 112 S.Ct. 2649 ("The question is not the good faith of the school in attempting to make the prayer acceptable to most persons, but the legitimacy of its undertaking that enterprise at all when the object is to produce a prayer to be used in a formal religious exercise which students, for all practical purposes, are obliged to attend."); see id. at 590, 112 S.Ct. 2649 ("Though the efforts of the school officials in this case to find common ground appear to have been a good-faith attempt to recognize the common aspects of religions and not the divisive ones, our precedents do not permit school officials to assist in composing prayers as an incident to a formal exercise for their students.").
 
 
 214
 It is without question, therefore, that the Court has been particularly vigilant in ensuring that our elementary and secondary schools not favor religion through religious exercise or otherwise. The majority concedes that the menorah and star and crescent convey a religious message, but maintains that the State may employ some religion in schools in light of its goal to celebrate the holiday season. However, as Justice Kennedy stated in Lee, "the inspiration for the Establishment Clause [is] the lesson that ... what might begin as a tolerant expression of religious views [in public schools] may end [up] ... put[ting] at grave risk the freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." 505 U.S. at 591-92, 112 S.Ct. 2649. The Supreme Court has made clear that government action that may be permissible in the general public domain, i.e., displays in public squares, can be impermissible when it takes place in our public schools. See, e.g., id. at 593, 112 S.Ct. 2649 ("We do not address whether [the choice between objecting to religious exercise or participating] is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position."). The "context" here — elementary and secondary public schools — and the "use" of the religious symbols — i.e., as "celebratory" tools — are quite significant here. Cf. Van Orden, 125 S.Ct. at 2869 (Breyer, J., concurring in the judgment) (noting the import of the "context" and "use" of the Ten Commandments display in Establishment Clause inquiry).
 
 
 215
 Furthermore, no student should be charged with the vast amount of specialized knowledge the majority charges to its "reasonable observer," including that "many devout Christians use crèches to commemorate the religious miracle of Christmas, [but that] these Christians and countless nonbelievers also share in the numerous secular traditions of the Christmas holiday," ante at [35], or that "the Supreme Court had approved a holiday display in which Christmas was represented by a Christmas tree and Chanukah by a menorah to convey the permissible secular message of pluralism," id., or that the DOE's characterization of the star and crescent as secular resulted from its settlement of a lawsuit, id. at [21-22 n. 18]. Nor can we charge an elementary or secondary school student with the knowledge that "the public had (after Allegheny) increasingly come to accept the display of a menorah together with a Christmas tree as a symbol of tolerance and freedom associated with the holiday season," id. at [35 n. 28].[4]
 
 
 216
 Additionally, the majority's objection on the grounds that the record contains no "trial evidence" showing "the effect of the challenged displays on any child," ante at [26], is off the mark. First, the majority uses a double standard here — there is no factual evidence in the record to support the majority's contentions as to the effect of the display on its "adult" reasonable observer. The majority erroneously claims that it is allowed to rely on the Supreme Court's conclusions in Allegheny, which were based on a display with a completely different history, context, and community. Ante at [26]. The rest of the "effect" evidence claimed by the majority is the same evidence on which the dissent bases its conclusions, i.e., the record evidence concerning what objects are allowed in the displays. Ante at [26]. Finally, the majority commits the very "error" of which it accuses the dissent — the majority speculates as to the perspective of a child where it concludes that "the religious significance of a crèche may be more obvious to the average schoolchild than that of the menorah and the star and crescent," ante at [28].
 
 
 217
 Additionally, and more importantly, this is not a purely factual issue. As Justice O'Connor stated in Lynch, a district court's determination of "whether a government activity communicates endorsement of religion is not a question of simple historical fact.... [T]he question is ... in large part a legal question to be answered on the basis of judicial interpretation of social facts." Lynch v. Donnelly, 465 U.S. 668, 693-94, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Furthermore, the majority can hardly claim that such "effect" evidence is required for the facial challenge to the DOE's policy.
 
 
 218
 As an additional matter, I strongly disagree with the majority's characterization of the display as "cheerful" and "multicultural," ante at [19], as well as its claims that the disparate treatment given to the religions communicates a message that each of the religions is "entitled to everyone's respect," ante at [33]. It can hardly be claimed that the display of two religious objects together with winter decorations suggests to a young child that the purpose of the displays was to promote understanding and respect for the many cultural and religious traditions celebrated in New York City during the winter holiday season. I also strongly disagree that the displays of menorahs and stars and crescents, together with kinaras and candles, merely suggest to children that different traditions use "light" to celebrate holidays. Ante at [34]. Indeed, the displays suggest much more — that some religious groups celebrate miracles and that the winter season is significant for these — specially identified — religious groups. The DOE's choosing two religions to be represented in the displays hardly "permit[s] all children to feel included in some way," as the majority contends. Ante at [34]. Furthermore, the majority's claim that "the defendants treated the religious and secular origins of all winter holidays...with equal respect," ante at [34] and its heavy reliance on the "instruction cards" in so concluding, is misplaced. Ante at [29, 32-33]. These cards were only present in one classroom and their use is not required, if even suggested, by the DOE's holiday policy. In light of the foregoing, it is my view that an impressionable, though reasonable, student observer would view the displays' inclusion of religious symbols of the Jewish holiday of Chanukah and the Muslim commemoration of Ramadan, in the context of a "celebration," to convey the State's approval of Judaism and Islam.
 
 
 219
 I do not mean to suggest that religious symbols may never be displayed in public schools. The display of religious symbols as part of an organized program of education about different religions and cultures would likely be found constitutional. See Altman v. Bedford Cent. School Dist., 245 F.3d 49, 76 (2d Cir.2001) ("[W]hile schools have a constitutional duty to make certain that subsidized teachers do not inculcate religion, the Establishment Clause does not prohibit schools from teaching about religion." (alteration, internal citations, and quotation marks omitted)); see also Stone, 449 U.S. at 42, 101 S.Ct. 192 ("This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like."); Epperson v. Arkansas, 393 U.S. 97, 106, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("[S]tudy of religions and of the Bible from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition.") (emphasis added). That educational program with its attendant discussion and presentation of the practices of multiple religions might even take place during the winter months.
 
 
 220
 The Jewish and Muslim religious symbols here, however, are not used as part of an educational program on different religions and cultures. Despite the majority's efforts to save the DOE's policy by repeatedly characterizing it as an educational program, the DOE makes clear that the policy constitutes "guidelines [that] should be followed with respect to the display of cultural/holiday symbols," Holiday Display Memo. at 1, and that the religious symbols are used as a means to celebrate the secular holiday season, Appellees' Brief at 9 ("The Holiday Displays memorandum by its terms concerns seasonal displays of cultural/holiday symbols. It does not concern the subject or manner of classroom instruction."); Dahan Decl., Ex. B (statement from teacher to Skoros indicating that class would be "having a party to celebrate the holiday"). Appellees submit that any purported education comes as a residual effect of the celebration, see Appellees' Brief at 25 (describing the policy as proscribing the "manner of permitting the Department's multicultural body to celebrate the holiday season in a secular fashion and to use this celebration to educate the students about religions and cultures other than their own") (emphasis added); see also Skoros v. City of New York, No. CV-02-6439 (CPS), 2004 U.S. Dist. LEXIS 2234, at *13, *26 (E.D.N.Y. Feb. 18, 2004) (district court finding that education about holidays was in context of classroom "celebrat[ion]"); they make no claim that the displays are part of a curriculum about religion and culture. Moreover, the cards mentioned by the majority that explain the holidays and their cultural significance, ante at [9-10, 29, 32-33], were located only in one of the elementary school classrooms and appear to reflect only one schoolteacher's interpretation of the policy. Therefore, it is clear that the policy governs (and sanctions) the celebration of the secular holiday season within classrooms and does not constitute an educational curriculum — either formal or informal — concerning different religions and cultures. The Supreme Court has never explicitly sanctioned a public school's use of religious symbols as a means of celebrating the secular holiday season, as opposed to part of a program of education; even assuming such use is acceptable, the use of religious symbols of some religions and not others in such a celebration causes the endorsement problems noted above.
 
 
 221
 In sum, I find it clear that the current policy and displays violate the Establishment Clause insofar as a reasonable student observer would perceive a message of endorsement of Judaism and Islam and a reasonable parent observer would perceive a message that Judaism and Islam are favored and that Christianity is disfavored.
 
 3. Entanglement
 
 222
 The endorsement problem here is exacerbated by the Holiday Display Memorandum's definition of some symbols as per se secular. The Memorandum defines a "Christmas tree, menorah, and star and crescent" as secular holiday decor and indicates that a display of such items is appropriate as long as the objects of one religion do not predominate the display. The DOE also concedes that it defines a crèche as a "purely religious" symbol for purposes of the Holiday Display Memorandum. In Commack Self-Service Kosher Meats v. Weiss, 294 F.3d 415 (2d Cir.2002), we held (using a combined endorsement/entanglement analysis) that the State's defining "kosher" as "prepared in accordance with orthodox Hebrew religious requirements," id. at 423, violated the First Amendment because it suggested a "preference for the views of one branch of Judaism" over another branch, id. at 427. We also held that the State's involvement in determining whether foods could be labeled "kosher" constituted excessive entanglement under the Establishment Clause because it "adopt[ed] an official State position on a point of religious doctrine" and required the State to "either interpret religious doctrine or defer to the interpretations of religious officials in reaching its official position." Id. at 427; see also County of Allegheny v. ACLU, 492 U.S. 573, 593-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (stating that "[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief"); Tribe, supra § 14-11, at 1231 (describing "doctrinal entanglement" as reflecting the conviction that government "must never take sides on religious matters"); Tribe, supra § 14-11, at 1231 ("`If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion ....'" (quoting West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943))).
 
 
 223
 It is my view that the DOE's policy risks excessive entanglement inasmuch as it "adopts an official State position on a point of religious doctrine" by defining a menorah and star and crescent as secular symbols, and a "crèche" as "purely religious." It is for this reason that I find entanglement, not for the other reasons rejected by the majority. I agree with the majority, for example, that the policy does not require the kind of constant monitoring found objectionable in Lemon v. Kurtzman, 403 U.S. 602, 619, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), that defendants "do not attempt to inject state authority into any sectarian institution," ante at [37], that the government does not "ced[e] government authority to any religious sect or group," id. at [37-38], and that there is no "fusion of government and religious authority," id. at [38].
 
 
 224
 As noted in Kaplan, however, some Jews "would disagree with the apparent suggestion that a menorah itself has a significant secular import." Kaplan v. City of Burlington, 891 F.2d 1024, 1028-29 (2d Cir.1989). It would not be unreasonable to assume that they would take issue with the DOE's pronouncement of a menorah as being in the same category of symbols as a Christmas tree. On the other hand, "some nonreligious American Jews celebrate Chanukah as an expression of ethnic identity and as a cultural or national event rather than as a specifically religious event." Allegheny, 492 U.S. at 585, 109 S.Ct. 3086 (internal quotation marks omitted). Muslims might be similarly split as to the DOE's treatment of the star and crescent. Christians likely might take offense to the statement that a crèche is "purely religious," a contention that implicitly rejects the historical nature of the symbol. Justice Souter aptly questioned a state's competence to distinguish between the religious and secular in Lee:
 
 
 225
 In many contexts ... nonpreferentialism requires some distinction between "sectarian" religious practices and those that would be, by some measure, ecumenical enough to pass Establishment Clause muster. Simply by requiring the enquiry, nonpreferentialists invite the courts to engage in comparative theology. I can hardly imagine a subject less amenable to the competence of the federal judiciary, or more deliberately to be avoided where possible.
 
 
 226
 505 U.S. at 616-17, 112 S.Ct. 2649 (Souter, J., concurring.).
 
 
 227
 In my view, therefore, the DOE's action in defining a menorah and star and crescent as secular, and a crèche as "purely religious," is impermissible insofar it takes positions on divisive religious issues. I concede that the balancing necessary to ensure that a public holiday display conveys an overall secular message necessarily requires government officials to determine the degree to which certain symbols are secular or religious. Thus, even if the DOE's policy did not define which objects are secular and which are religious, some official would have to make that determination in connection with the displays. That notwithstanding, it is my view that pronouncement of certain symbols to be per se secular is excessive entanglement, which is proscribed by the Establishment Clause. See Agostini v. Felton, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("Interaction between church and state is inevitable and we have always tolerated some level of involvement between the two. Entanglement must be `excessive' before it runs afoul of the Establishment Clause." (internal citation omitted)).
 
 
 228
 Moreover, the DOE's policy does not affect only government speech, as the majority contends, ante at [36]. Rather, it governs the conduct of children and parents — it dictates what symbols the public schoolchildren may draw or otherwise create for use in the displays, as well as what objects parents may send with their children for use in the displays. To this extent it does "dictate to a[] private group or person ... an[] official view of what are the secular or religious symbols of particular holidays," ante at [37]. Moreover, the fact that it does so "exclusively within public schools" does not save its unconstitutionality, ante at [37]. Each of the symbols at issue relates to commemorations of significant faith-based events and the DOE dictates to teachers, parents, children, and others within the relevant community which symbols used in such commemorations are "religious" and which are "secular."
 
 II. Free Exercise and Parental Rights Claims
 
 229
 I concur in the majority's holdings as to Skoros's Free Exercise and parental rights claims. I find those claims to be without merit for reasons similar to those stated by the majority and the District Court. Though I find that the displays and policy violate the Establishment Clause, the record in this case does not demonstrate that the holiday displays or policy "placed a substantial burden" on the Skoros children's ability to practice their faith, Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 79 (2d Cir.2001), nor does the record demonstrate that the displays or policy substantially burdened Skoros's ability to control the religious or general upbringing and education of her children.
 
 IV. Conclusion
 
 230
 For the foregoing reasons, I concur in the majority's affirmance of the District Court's rejection of Skoros's Free Exercise and parental rights claims. I respectfully dissent from the majority's opinion on the Establishment Clause claim and would vacate and reverse the judgment of the District Court in that respect.
 
 
 
 Notes:
 
 
 [1]
 Although the majority phrases the DOE's stated purpose slightly differently,ante at [18], any dispute is merely semantic; even the District Court characterized the DOE's purpose as "the celebration of multiple winter holidays," Skoros v. City of New York, No. CV-02-6439 (CPS), 2004 U.S. Dist. LEXIS 2234, at *29 (E.D.N.Y. Feb. 18, 2004).
 
 
 [2]
 At the time the suit was brought, Nicholas Tine was ten years old, and Christos Tine was nine years old. They are both students in elementary public schools under the aegis of the DOE. Therefore, for the "as applied" challenge, the reasonable student observer is an elementary school student, and, because the policy applies to all New York City public schools, the facial attack requires us to consider the reasonable student observer to be either an elementary school child or a secondary school student
 
 
 [3]
 Even if I were to consider the displays and celebrations from the perspective of a "model" reasonable student of no particular religion, I would still hold that such observer, imbued with an understanding of the differing religions represented in the school as well as the history and context of the displays, would view the displays as endorsing Judaism and Islam and/or requiring participation in the celebration of Jewish and Muslim religious holidays
 
 
 [4]
 The foregoing informationmight be imputed to the parent observer, but it is my view that, for the reasons noted above, even that parent observer, charged with such knowledge, would not unreasonably perceive the State's endorsement of Judaism and Islam and disapproval of Christianity.